654 So.2d 480 (1995)
Mary Jones SMITH[1]
v.
John JONES.
No. 91-CA-01184-SCT.
Supreme Court of Mississippi.
March 30, 1995.
Evan L. Thompson, Forest, for appellant.
Thomas Q. Brame, Jr., Bay Springs, for appellee.
En Banc.
SMITH, Justice, for the Court:
This case comes to this Court from the Chancery Court of Scott County on appeal of Mary Jones Smith (hereinafter Smith), aggrieved from the change of primary physical custody of her minor daughter, Carolyn, to the father, John Jones (hereinafter Jones). The chancellor found that it would not be in Carolyn's best interest for her legal custody to be placed with either parent and thus allowed joint custody of Carolyn to remain with both Smith and Jones as had been provided by the terms of the settlement *481 agreement of the final divorce decree. However, the chancellor changed the primary physical custody based on the testimony of Paulette Hall, a social worker/child therapist, that Carolyn, as a six-year old, had obtained a precocious knowledge of human sexual behavior by allegedly observing her mother and stepfather's sexual activity. Hall testified that such precocious knowledge constituted child "sexual abuse."
Smith raises the following issues:
(I) Whether the hearsay testimony of a child of tender years regarding alleged sexual abuse is admissible under any lawful exception as provided by M.R.E. 803 when proffered by a social worker/child therapist.
(II) Whether the opinion testimony of a social worker/child therapist was inadmissible because the foundation tendering the witness as an expert was improper and whether her subsequent testimony regarding the use of anatomically correct dolls was improper because it is not a treatment accepted as proper therapy by the mental health profession.
(III) Whether it was proper for the chancellor to change custody of Carolyn from her mother to her father solely on the basis of alleged activities observed by the child between the mother and the mother's husband. This error was compounded by not requiring any showing that the best interest of Carolyn required a change.
On counter-appeal, Jones raises the following issues:
(I) Whether the chancellor's award of $100 per month in child support is inadequate.
(II) Whether the chancellor erred by not awarding Jones reasonable attorney's fees.
After careful examination, we find Issue III to be meritorious and dispositive of the case at bar, therefore we find no need to discuss the remaining issues raised by Smith. We also find no merit whatsoever to Jones' issues on his counter-appeal.
Admittedly, Smith's sexual conduct under circumstances allowing for Carolyn to "possibly" observe, was both inappropriate and exhibited poor judgment by Smith, if true. Nevertheless, this Court declines to affirm the chancellor's opinion based solely upon Paulette Hall's testimony that Carolyn's precocious knowledge of sexual behavior was acquired by observing her mother and stepfather's sexual activities. This is especially so when Hall claimed such conduct was "child sexual abuse" in direct contravention of Mississippi's legal definition of the term. The chancellor's finding of a material change in circumstances and adverse effects upon the child was based solely upon Carolyn's precocious sexual knowledge derived from supposedly viewing her mother and stepfather's sexual activities. This case simply does not involve child sexual abuse. There was absolutely no sexual contact "performed with or on the child" as defined in M.R.E. 803(25) or "upon" the child as defined in Miss. Code Ann. § 43-21-105(m) (1972). The overwhelming proof clearly showed that if Carolyn's knowledge was "possibly" derived from her mother and stepfather's sexual activities, that their actions were certainly not deliberate.
This Court has held that a chancellor cannot use the indiscretions of the custodial parent as the sole ground to change child custody but must look at the overall facts of the case. Kavanaugh v. Carraway, 435 So.2d 697 (Miss. 1983). The totality of the facts and circumstances in evidence in the case sub judice fail to support any modification of Carolyn's primary physical custody. Ballard v. Ballard, 434 So.2d 1357 (Miss. 1983). The chancellor's decision is manifestly erroneous. We reverse and render.

FACTS
Mary Jones Smith and John Jones were formerly husband and wife. One child, Carolyn Jones, was born of the marriage on January 29, 1985. On April 13, 1990, Smith and Jones were granted a divorce on grounds of irreconcilable differences. The parties agreed to joint physical and legal custody of Carolyn with the primary physical custody given to Smith, who subsequently remarried. *482 Jones also remarried and exercised visitation rights with Carolyn.
During the course of Carolyn's visits with Jones, he noticed what he considered to be some behavioral problems. Additionally, Jones testified that in May and June of 1991, Carolyn asked him about his "body parts" several times. Jones' mother retained the services of social worker/child therapist, Paulette Hall, apparently seeking some type of diagnosis or treatment of Carolyn. Hall conducted a series of therapy sessions with Carolyn while Carolyn was visiting with her father during an extended summer vacation. Hall initially advised Jones and his mother that if she determined that the child was being abused she would have to report it.
During the course of two of these therapy sessions, on June 10, 1991 and July 15, 1991, Carolyn expressed an interest in certain anatomically-correct dolls that were displayed in Hall's office. According to Hall, Carolyn, using the dolls, demonstrated her mother and stepfather in sexual intercourse and also exhibited a vast knowledge of oral sex. However, Carolyn objected to Hall's taking notes of their conversation and on one occasion implored Hall to "stop writing what I'm saying." Carolyn also recanted her prior statements to Hall about her mother and stepfather. On July 15, 1991, during a session with Hall, Carolyn stated that "I did not say that." No references were made by the child to sexual conduct in any of the other three sessions with Hall. From these two sessions, Hall concluded that Carolyn had a precocious knowledge of sex for a six-year old, which Hall opined constituted child sexual abuse. Hall claimed that children would not have this knowledge unless they had been abused. Hall testified that in her opinion, this knowledge was not an accidental witnessing of the parent's sexual actions. She also noted Carolyn's lack of attention and her hyperactivity. Hall testified that the only type of treatment she utilized for Carolyn was "behavioral modification" which is the proper method for treating hyperactive children.
Dr. Charlton Stanley, a psychologist, testified as Smith's expert witness. Dr. Stanley's opinion was that he could not identify the source of Carolyn's sexual knowledge and opined further that in today's society it is impossible for a five year old not to have been exposed to sexual behavior. He couldn't say where or how Carolyn acquired such knowledge and stated neither could anyone else, as it would be mere speculation. He noted it was "possible" that Carolyn had accidently observed Smith and her husband having sexual relations, but that if true, based on his evaluations and extensive testing of the parties, Smith's actions were certainly not deliberate. Stanley's tests revealed Smith and her husband to be normal, but his tests on Jones revealed stress which was conveyed to Carolyn, thereby contributing to the child's behavioral problems. He stated that Jones had severe problems with parenting which would continue to worsen, and that "the child is a real problem for Jones, but not for Smith."
Carolyn's two teachers, Liz Langley and Teresa Brown, testified that Carolyn was "no different than all the other kids; not `hyper' and not a behavioral problem." They stated that children of this age group were aware of "sexual things, and that they know a lot more than we think they do." Brown stated children often talked about their mothers going to bed naked with their daddies.
Smith vehemently denied that Carolyn was a victim of sexual abuse or that she had been knowingly exposed to sexual acts of the Smiths performed in the privacy of their bedroom. Smith admitted that Carolyn had slept in their bedroom on "two or three occasions" specifically mentioning several days when their air conditioner was broken. Smith admitted that she and Glen had engaged in sexual relations, but she did not believe the child had witnessed such activities.
Based on the information provided to him by Hall and other sources[2], Jones sought *483 and obtained, in the Chancery Court of Scott County, a temporary restraining order (TRO) to retain custody of Carolyn until a modification hearing could be completed. This TRO went into effect on July 18, 1991. The trial on the issues of modification, and a trial of a counterclaim for contempt, occurred on August 27-29, 1991. The chancellor found that Jones had met his burden of proof and had established a substantial and material change in circumstances and that this change adversely affected the child. The chancellor then found that it would not be in the best interest of Carolyn for her legal custody to be placed with the Smiths or Jones by the continuing of joint physical and legal custody, but found that the best interests of the child were served by a change in the primary physical custody of the child from the mother to the father. Furthermore, the chancellor ordered Smith to pay to Jones $100 per month in child support.
From this decision, Smith appealed. Jones cross-appealed, arguing that the chancellor's grant of child support was inadequate and that the court erred in not awarding him reasonable attorney fees.

DISCUSSION OF LAW

WHETHER IT WAS PROPER FOR THE CHANCELLOR TO CHANGE CUSTODY OF THE MINOR, CAROLYN FROM HER MOTHER TO HER FATHER SOLELY ON THE BASIS OF ALLEGED ACTIVITIES OBSERVED BY THE CHILD BETWEEN THE MOTHER AND HER HUSBAND. THIS ERROR WAS COMPOUNDED BY NOT REQUIRING ANY SHOWING THAT THE BEST INTEREST OF CAROLYN REQUIRED A CHANGE OF CUSTODY.
The chancellor's opinion primarily centers around the testimony of Smith, her husband Glen, Dr. Charlton Stanley and Paulette Hall. An examination of their respective testimony is helpful in addressing and evaluating the chancellor's ultimate opinion in this case. Equally revealing is the testimony of Carolyn's two school teachers.

1. THE SMITH'S TESTIMONY
Smith testified that Carolyn had on occasions slept by the Smith's bed on a pallet on the floor. Smith stated that Carolyn "stayed there several nights when our air conditioner was messed up." Smith admitted that she and Glen Smith had engaged in sexual activity, but when questioned as to whether Carolyn had witnessed this activity Smith stated, ... "possibly" ... "I don't think she ever has." Regardless, Smith stated it could only have occurred two or three times. Glen Smith, in answer to the same question responded that he didn't think Carolyn had ever seen them engaged in sexual activities.

2. THE EXPERTS' TESTIMONY
Hall testified that during her first consultation with Carolyn, on June 10, 1991, they drew pictures and engaged in small talk. At some point, Carolyn noticed four anatomically-correct dolls in Hall's office and she began playing with them, demonstrating explicit sexual conduct.
The second session lasted only 15-20 minutes because Carolyn was too agitated. Nothing happened during this session. During the third session, Carolyn was extremely agitated and the session ended quickly.
During the fourth session, Hall testified that Carolyn was much more relaxed. Carolyn began playing with the dolls, took the cloth tongues out of the dolls, and told Hall that you "kiss with your tongues." Hall also testified that Carolyn undressed all four of the dolls, kissed one of the dolls on the mouth, placed her mouth over both of the breasts of the dolls, and placed the male doll on top of the female doll and moved them in "up and down motions." Hall testified that Carolyn then took one of the male dolls and *484 crawled under a desk. Hall saw Carolyn emulate oral sexual movements. She also asked Carolyn whom she had seen on top of each other and Carolyn responded that it was her mother and stepfather.
The next session with Carolyn was on July 29, 1991. Carolyn was very calm and relaxed. The two colored for most of the time and at one point Carolyn undressed a male doll and told Hall to take it to the bathroom. Hall said she did not know how to do this, and Carolyn showed her by holding the doll's penis.
In the next session on August 6, 1991, Carolyn appeared irritated. Carolyn undressed the dolls and took them to the bathroom, again holding the male doll's penis. Carolyn then pulled the tongues out of the dolls and began rubbing them together, stating that they were kissing. Late in the session, Carolyn drew a picture of a male figure, which included a penis.
At the final session on August 12, 1991, Hall testified that Carolyn again removed the male doll's clothing and demonstrated oral sexual conduct. Hall stated that Carolyn had become agitated and objected to Hall writing down what she had told Hall about her mother and stepfather. Carolyn recanted her prior statements to Hall on one occasion concerning what she supposedly had observed regarding the sexual activities of her mother and stepfather.
Hall testified that her opinions were based upon the statements made to her by Carolyn. Hall stated that she accepted Carolyn's statements as true and needed no corroborating testimony or evidence. She maintained that children rarely lie regarding sexual abuse. Finally, Hall testified that in her opinion, Mary and Glen Smith had in fact engaged in explicit sexual behavior, without inhibition, in the presence of Carolyn. Hall also testified that she did not believe Carolyn's witnessing of the sexual activities was accidental, and that in her view, children would not have this type of knowledge unless they were abused. Hall said that she considered this exposure to explicit sexual activities by Smith and her husband Glen to be sexual abuse of the child.
Dr. Charlton S. Stanley, Smith's expert psychologist, testified that Smith had not deliberately exposed Carolyn to viewing the Smith's private sexual activity though it was "possible" that Carolyn might have accidentally witnessed sexual activity between Smith and her husband. Dr. Stanley could not identify the source of Carolyn's knowledge and opined that in today's society it would be impossible for a five year old not to have been exposed to human sexual behavior. Dr. Stanley testified that neither he or anyone else could say how Carolyn gained this knowledge as any such opinion would be mere speculation. Dr. Stanley stated he did not use anatomically correct dolls for evaluation purposes. He used dolls only for therapy, as it was his opinion their use for evaluation was not reliable or valid. Dr. Stanley explained his opinion by stating that our society encourages children to play and fantasize with gender neutral dolls and that a child's play and fantasy was naturally heightened by anatomically correct dolls especially upon first time exposure. He noted that Hall was the only source to claim that Smith and her husband had intentionally, or without inhibition, allowed Carolyn to "possibly" witness their sexual behavior. No other witness substantiated these allegations.
Dr. Stanley testified that recordation by video tape of sessions using anatomically correct dolls was the best protocol. He maintained that Hall followed no protocol whatsoever, and that alone should render Hall's opinions and observations suspect. Dr. Stanley compared the video recordation requirement with that mandated prior to the use of hypnotically refreshed testimony. See House v. State, 445 So.2d 815 (Miss. 1984). In Dr. Stanley's opinion, as opposed to Hall's, he did not consider Carolyn to be "abused"[3] *485 or sexually traumatized. Dr. Stanley stated that the fact that a child sees something that she should not have seen is not child abuse. Dr. Stanley maintained that it would not be at all uncommon for a child to relate a story the child may have heard, or an incident the child may have witnessed, or complete fantasy from the child's mind, adding thereto the names of real persons in the child's life, or actual places with which the child is familiar.
Dr. Stanley placed great significance upon a child recanting her story as always a "red flag." He concluded that recantations always reduce his confidence in the trustworthiness of a child's story. He also strongly disagreed with Hall's assertion that "young children rarely lie about sexual abuse."
Dr. Stanley conducted extensive evaluation tests on Smith, Glen Smith, Jones, and Carolyn. Stanley concluded that Smith's test results revealed "a normal lady under a lot of situational stress, due to depression from missing her child ... she appears to be about as normal as any parent I have seen and is a fit parent." Dr. Stanley's test results revealed Glen Smith to be "normal in all respects." He did not feel Glen had intentionally exposed himself to Carolyn.
However, Dr. Stanley's extensive testing of Jones revealed that "this child is not Jones' hoped for child, not what he bargained for." Dr. Stanley opined that this created stress in Jones' life, which was conveyed to the child thereby contributing to the child's behavioral problems. Dr. Stanley maintained that Jones' parenting stress index presented a markedly different description than that of the Smiths. He thus concluded that Jones had severe problems with parenting and that "the child is a real problem for Jones, but not for Smith."

3. THE SCHOOL TEACHERS' TESTIMONY
Liz Langley and Teresa Brown, teachers at Manchester Academy, testified that Carolyn was always neat, clean, cooperative, eager to learn, and "no different than all the other kids." They both testified that Carolyn was not "hyper" and not a behavioral problem. Both testified that based on their experiences as teachers, children of this age group were very aware of "sexual things, and that they know a lot more than we think they do." Brown testified further that children ask her about french kissing and often talked about their mothers going to bed with their daddies naked. Brown, when questioned whether children this age should know about oral sex, responded, it is not the norm, but "I honestly feel like some of them know about it."

STANDARD OF REVIEW AND APPLICABLE LAW
This Court's familiar standard of review applies. "On appeal this Court will not reverse a Chancery Court's factual findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence in the record supporting these findings of fact." Cooper v. Crabb, 587 So.2d 236, 239 (Miss. 1991; citing Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss. 1987).
This Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. Bowers Window and Door Co., Inc. v. Dearman, 549 So.2d 1309 (Miss. 1989) (citing Culbreath v. Johnson, 427 So.2d 705, 707-708 (Miss. 1983); See also, Bullard v. Morris, 547 So.2d 789, 791 (Miss. 1989).
*486 The admissibility of evidence rests within the trial court's discretion. Hall v. State, 611 So.2d 915, 918 (Miss. 1992); Wade v. State, 583 So.2d 965, 967 (Miss. 1991). This Court will not reverse the chancellor's ruling unless his judicial discretion is abused. Hall, 611 So.2d at 918.
The bottom line to this case is that Carolyn was apparently brought to Hall for a medical diagnosis  Jones wanted to learn whether the child had been sexually abused. After learning of Hall's opinion, Jones sought a change in custody based on Carolyn's acquiring of precocious knowledge which Hall called "sexual abuse." However, the case sub judice is not a child "sexual abuse" case because there was not sexual contact performed with or on the child by another.[4]
The chancellor allowed Hall's testimony over objection by Smith. The chancellor's opinion states that he relied upon the statements of Smith, Glen Smith and Dr. Stanley. It is abundantly clear that the chancellor's opinion relied more heavily upon Hall's testimony.
The prerequisites to a child custody modification are: (1) proving a material change in circumstances which adversely affects the welfare of the child and (2) finding that the best interest of the child requires the change of custody. However, there must be a sufficient basis for the chancellor's opinion in order for this Court to say that the chancellor has not abused his judicial discretion. See Hall, at 918. Except for the sole "possible" improper allowance of her daughter to witness sexual acts between her and her husband, Smith's behavior and care for Carolyn in all other respects was good. Dr. Stanley's extensive testing of Smith revealed that she was "normal" and a fit parent. The parties even stipulated that the testimony of certain witnesses in the record would be:
(1) That Smith had a good home.
(2) That Smith and Carolyn had a good, loving and caring relationship.
(3) That Carolyn was not "hyper" while she was with Smith and the maternal side of her family.
(4) That Carolyn was a good child while she was with Smith and her family.
(5) That Carolyn was generally obedient.
(6) That Carolyn was basically a good and normal child.
The record clearly indicates that witnesses did testify according to the stipulation.
This Court finds it difficult to say, in view of our precedential cases, that the chancellor was not manifestly in error in primarily relying upon Hall's testimony as supporting a material change in circumstances. The Smith's testimony, even if true, appears to reflect isolated incidents rather than a normal routine. Hall's improper conclusion that Carolyn's precocious knowledge constituted "sexual abuse" makes her testimony and credibility in this case highly suspect. Dr. Stanley's testimony is totally overpowering when compared to Hall's testimony. The chancellor recognized the credibility of what Dr. Stanley stated, even to the point of adopting some of his suggestions concerning counseling for all parties. It appears the chancellor placed no significance whatsoever on the two school teachers' testimony, which supported Dr. Stanley's expert opinion. The teachers testified that Carolyn presented them no behavioral problem, that Carolyn was not "hyper", and that children of this age group were very aware of "sexual things."
The Court, in Cheek v. Ricker, 431 So.2d 1139 (Miss. 1983), considered certain indulgence by a mother in moral indiscretions. The mother was found to be a fit and suitable person to have custody of the minor child and the Court affirmed the lower court's denial of a change of custody on the father's petition. The case involved, in part, "whether Pamela's post-divorce romantic interests can be considered a change in circumstances." The Court first noted that whether "Pamela developed a romantic relationship with another man after the divorce is relevant to the extent  and only to the extent  that such a relationship can be shown to have *487 had a definite adverse effect on the child." Id. at 1144.
The Court ultimately concluded, after reviewing evidence that the mother was "a fit and suitable, if not perfect, person to have the care and custody of the child," that the chancellor correctly determined a change of custody was not warranted. Id. at 1145. The Court stated:
[T]he chancellor correctly understood and applied the law in this case. If the mother's indiscretions with another man do not, in a divorce action, constitute a per se barrier to an award of child custody, it makes no sense that such a barrier should be erected in custody modification proceedings. Similarly, it hardly seems rational that the age of the child should per se lead to any particular result.
Id.
In a footnote, the Court in Cheek observed its holding was comparable to that of other jurisdictions:
Our view of custody modifications articulated above is comparable to that employed in others states in similar fact situations. See, e.g., Roberson v. Roberson, 370 So.2d 1008, 1011 (Ala. Civ. App. 1979) ("a mother will not be denied custody for every act of indiscretion or immorality", especially where no detrimental effect on the welfare of the child has been shown); Rippon v. Rippon, 64 Ill. App.3d 465, 21 Ill.Dec. 135, 381 N.E.2d 70, 73 (1978) ("indulgence in moral indiscretions alone is not grounds for a change of custody where the children are leading a normal life").
Cheek, 431 So.2d at 1145, fn. 4.
Returning to the case at bar, here we are not considering the "moral indiscretion" of an unmarried woman, but rather supposed unintentionally witnessed sexual activities of a husband and wife by a minor child. Applying the reasoning of Cheek certainly warrants this Court's reversal of this case. The meager proof relied upon by the chancellor is both insufficient and fails to show a definite adverse effect on Carolyn.
In Ballard v. Ballard, 434 So.2d 1357 (Miss. 1983), this Court considered whether there was a sufficient basis in the evidence to warrant changing custody of the minor child where the mother admittedly allowed a boyfriend to spend the night in her apartment on three occasions when her young son was present.
This Court reversed and rendered, holding: "Only that behavior of a parent which clearly poses or causes danger to the mental or emotional well being of a child (whether such behavior is immoral or not), is sufficient basis for a court to consider the `drastic legal action of changing custody.'" Id. at 1360.
In situations which appear to be isolated incidents rather than the normal rule, this Court has stated that it must be the overall circumstances in which a child lives, likely to remain unchanged in the foreseeable future and adversely impacting a child, to warrant a change of custody. Tucker v. Tucker, 453 So.2d 1294, 1297 (Miss. 1984).
In the case sub judice, not only do we have insufficient evidence constituting the supposed material change in circumstances which would warrant a change in custody, we see an almost identical situation to Ballard, with no finding that the situation would likely remain unchanged in the foreseeable future. Additionally, when we consider the overall circumstances in which Carolyn lived, with the exception of Smith's "possible" exposure of Carolyn to Smith's private sexual behavior with her husband, Smith's behavior and care of Carolyn in all other respects was very good. The totality of the evidence reveals clearly that Smith was a fit and suitable parent for Carolyn. In Tucker, the mother alleged abusive conduct by the father after the child returned from a visit with bruises. The testimony was in dispute as to how the bruises occurred, whether inflicted or the result of a bicycle accident. This Court affirmed the chancellor's determination that no change of circumstances justifying a change in custody had been demonstrated. The Court stated: "An isolated incident, e.g., an unwarranted striking of a child, does not in and of itself justify a change of custody." Id. at 1297. The Court concluded, the chancellor must find "that the overall circumstances in which a child lives have materially changed and are likely to remain materially changed for the foreseeable future and, of course, that *488 such change adversely impacts upon the child." Id.
The Court further stated the following guidelines:
A change in custody should never be made for the purpose of rewarding one parent or punishing the other. It should be made only where there has been a material change in circumstances adversely affecting the child and where, having in mind the considerations discussed above, the chancellor determines that such a change is in the best interests of the child.
Id.
In a case strikingly similar to the case sub judice, Kavanaugh v. Carraway, 435 So.2d 697 (Miss. 1983), the Court, found that the conduct of the mother and her new husband constituted a "moral error." Nevertheless, when considering the totality of the circumstances, the facts of the case dictated leaving the children where they were rather than changing custody. In Kavanaugh, the mother appealed from a chancellor's order changing primary custody of two of the three children based on the fact that the mother lived with her new husband-to-be for one month prior to their marriage. The Court reversed and rendered. The inquiry the Court undertook in reaching its decision was "whether the one month of cohabitation between Mr. and Mrs. Kavanaugh prior to their marriage was a `material change in circumstances which adversely affects the children's welfare.'" Id. at 699. The Court considered the testimony of the mother and her new husband, who admitted "their conduct was a moral error, however, there is no evidence in the record that indicates the month of cohabitation had any adverse effect on the children whatsoever." Id. at 700.
The Kavanaugh Court concluded:
In a proper case where such conduct is shown to exist and that such conduct has produced a substantial detrimental effect upon the children  the chancellor should consider same in determining what is the best interest of the children. Therefore, when weighed in light of the totality of the circumstances such conduct may constitute a material change in circumstances. The facts in this case fail to establish this detrimental effect, but on the contrary, the totality of the circumstances dictate leaving the children with the appellant.
Id. at 701. (emphasis added).
For a result and factually situation closely analogous to Kavanaugh, see also Woodruff v. Woodruff, 418 So.2d 775 (Miss. 1982).
Finally, in Phillips v. Phillips, 555 So.2d 698 (Miss. 1989), where it appeared that the sole reason for changing custody was to punish Mrs. Phillips for acts of which the chancellor did not approve, this Court, while not condoning Mrs. Phillips' actions, would not allow the change of custody without sufficient proof that she was both a detriment to the child's present welfare and to his future well-being. In Phillips, the Court described the trial in the lower court, in which primary custody was changed from the mother to the father, as follows:
The thrust of the testimony to support the change in custody was that Mrs. Phillips had a romantic and sexual relationship with Mr. Coe. The record is limited in regard to the best interest of the young Justin. The trial proceeded as though the question was whether the custodial parent's sexual relations with a third person outside of marriage warranted modification of the child custody order. Such a relationship by itself does not.
Id. at 701.
The Court in considering the two-pronged test for modification found first, "there was no showing of an adverse affect on Justin" resulting from Mrs. Phillips' relationship with Mr. Coe, whom she had since married. Id. Second, "there was no evidence that the change of custody was in the best interest of Justin." Id. Indeed, the chancellor did not appear to consider where the child would live and who would care for him or how schooling would be arranged if custody were awarded to the father, a Naval officer. Id. The Court opined:
The Chancellor must not only look to the well-being of a child in his present custodial circumstance, but he must note with attention to specifics the environment and conditions pertaining to the child in the future. In the case sub judice Justin was *489 in the home, neighborhood and school that he had known throughout most of his brief life. Justin's life has been disrupted, precipitously, without a showing in this record of how he is to be cared for in the future.
Id.
The following quotes further reveal this Court's strong disapproval of the chancellor's decision:
This Court requires more than a verbal announcement of good law. It requires an adherence to and application of that law. A reading of the Chancellor's opinion leaves the strong impression that he was punishing Mrs. Phillips for acts of which he did not approve.
* * * * * *
The Chancellor would distinguish Kavanaugh, which holds a parent's indiscretion cannot be the sole ground to change custody. He stated that the mother in that case showed she was remorseful.
This Court in Kavanaugh was saying that even if what the mother did was a moral error, there still had to be an adverse effect on the children. The Chancellor's requiring remorse has nothing to do with the `adverse affect and best interest of Justin.' The issue is the best interest of Justin, not the alleged indiscretion of his mother.
Phillips, 555 So.2d at 702.
The Phillips Court reversed and rendered, concluding:
The Chancellor was not within the parameters set by this Court for custody modification. All the evidence points to the fact that Mrs. Phillips' behavior and care for Justin was in all other respects good. Her conduct was not shown to threaten the best interest of Justin.
* * * * * *
The `taking away' of Justin seems to be to chastise Mrs. Phillips for her behavior or because she was not apologetic or remorseful. This Court does not condone the behavior of Mrs. Phillips, but we will not condone punishing her by `taking' her son without proof that she is a detriment to his welfare of some attention to his future well-being.
Id. at 703.
In the case sub judice, the overwhelming proof established that Smith's "possible" exposure of Carolyn to the Smith's sexual activities in no way was a contributing factor to Carolyn's behavioral problems. If the child was a behavioral problem, she only was for Jones. Noteworthy is the fact that Carolyn was only treated for her supposed "hyper" condition. Hall testified that she only treated Carolyn with "behavioral modification, which is the proper method for treating hyperactive children." There was no testimony indicating any treatment afforded the child for any "precocious sexual knowledge." This Court, when considering the totality of the evidence, cannot say that sufficient proof existed that Smith's "possible" exposure of Carolyn to Smith's private sexual acts with her husband, definitely adversely effected Carolyn. Carolyn's behavioral problems, if any, appear to be directly attributable to Jones rather than Smith.
The chancellor in the case at bar, opined that he especially considered the testimony of Smith, her husband Glen, and Dr. Stanley, and that he considered the totality of the evidence. While the record does indicate some verbal disputes and occasional isolated pushing, shoving and occasional blows passed between the Smith's, the chancellor did not find that such isolated incidents adversely effected Carolyn or constituted a material change in circumstances. Indeed, the chancellor did not even mention such incidents in his findings and opinion. It is obvious that the only finding by the chancellor relied totally on Hall's allegations which she maintained constituted "sexual abuse."[5] The chancellor accepted Hall's opinion as reasonably pertinent to diagnosis or treatment. Yet, he expressed great concerns in recognizing that Hall, in using the dolls, failed to *490 follow protocol or guidelines and failed to transcribe or video the proceedings, which allows statements to be taken out of context, bent or shaped. The chancellor specifically remarked that, "Rules should be established and followed, and that is not the situation in this case." He expressed concern about the natural inquisitiveness of children when they had previously been exposed only to used neutral gender dolls; that the use of dolls may in and of itself be suggestive and misleading, thus lacking substantial indications of trustworthiness. The chancellor indicated he had grave concerns when a child intentionally or unintentionally is influenced by leading questions. The chancellor opined that he had given Hall's testimony less weight because of these grave concerns. If Hall's testimony was in fact given less weight by the chancellor, where then is any remaining sufficient supporting evidence for the chancellor's opinion? There is none absent Hall's testimony.
The chancellor relied only upon uncertain possibilities as to where Carolyn had acquired her "precocious sexual knowledge." Such reliance is insufficient to support the drastic action of changing Carolyn's custody under the facts of this case. After stating in his opinion that Carolyn certainly wasn't born with such knowledge, he asks the following question. "Where could she have acquired that precocious knowledge" and "What are the possibilities that Carolyn observed the Smith's sexual behavior"? He opines that the answer came from the Smiths and Dr. Stanley. Yet, both Smiths testified, while candidly admitting the "possibility" that Carolyn could have witnessed their sexual acts, that they did not believe she actually had observed them. Dr. Stanley also candidly told the court that although Carolyn could have "possibly" witnessed her mother and stepfather in sexual relations, it would have been accidental rather than deliberate. He noted the neither he nor anyone else, without resorting to speculation, could say where Carolyn acquired her knowledge. The chancellor's opinion is based on "possibilities" and mere speculation which is totally insufficient to warrant changing Carolyn's custody.
The chancellor's opinion mentions behavioral problems of Carolyn as a material change in circumstances. Where did Carolyn acquire these behavioral problems? According to Smith, she experienced no behavioral problems with Carolyn. The two school teachers experienced no behavioral problems with Carolyn and testified she was not "hyper." Dr. Stanley testified that the behavioral problems Carolyn exhibited were a direct result of Jones' stress conveyed to Carolyn which aggravated the problems with her. Dr. Stanley stated Carolyn was not "hyper." Dr. Stanley testified that Jones "loves" Carolyn, he just did not "like her." He opined further that Jones had severe problems with parenting which would only worsen unless addressed. The only behavioral problems complained of by any person who regularly dealt with Carolyn came from Jones and Jones' mother. Jones and Hall claimed Carolyn was "hyper." Thus, even under Jones' version it would be Carolyn's "hyper" activity that caused her behavioral problems. It should be obvious that it was only Jones who had difficulty controlling Carolyn, rather than Smith. It was Jones who conveyed his own stress to Carolyn, thereby worsening her situation. Any definite adverse effect upon Carolyn is thus attributable to Jones, not Smith.
Finally, in determining the best interest of the child, the chancellor could have recognized Dr. Stanley's suggestion that this problem could easily have been corrected by simply admonishing Smith and her husband to lock their doors in the future. Stanley stated that he had counseled several couples to lock their doors during sexual activities to prevent unintended observations by their children. Yet, the chancellor ignored this easy solution, while at the same time, giving credibility to many of Dr. Stanley's other specific recommendations for these parties.
When this Court considers the totality of all the facts and circumstances in evidence, the meager proof relied upon by the chancellor in his finding and opinion is insufficient to remove physical custody of this six year old female child from her mother for what was clearly the use of poor judgment only in "possibly" allowing for accidental exposure of *491 Carolyn to Smith's private sexual relations with her husband.
Dr. Stanley was persuasive. This situation was easily correctable, if it ever "possibly" took place as claimed by Hall. In addition to admonishing Smith to lock her door in the foreseeable future to prevent Carolyn from "possibly" viewing the Smith's private sexual behavior, the chancellor could have used all of Dr. Stanley's recommendations. Finally, the chancellor could have required the Department of Human Services to monitor the situation with frequent reports to the court. After utilizing all of these suggestions, if the situation did not change, was definitely adversely effecting Carolyn and the best interests of the child were clearly at risk at such time and in the foreseeable future, then certainly a change of custody as well as possible contempt of court would be warranted.
The chancellor found that it would not be in Carolyn's best interest that "her primary custody and control be placed with either Smith or Jones at this time, but that they should continue to maintain joint physical and legal custody of Carolyn." Then, in the very next paragraph of his opinion, the chancellor states, "that it would be in the best interest of the minor child" that the actual rights of physical custody be reversed under the terms of the original decree. The chancellor changed custody to Jones having just noted Jones' severe problems concerning stress which he conveyed to Carolyn and Jones' parenting problems which Dr. Stanley stated would only grow more severe unless addressed. The overwhelming testimony was that Carolyn's behavioral problems, if true, were brought on by or significantly contributed to by Jones' severe parenting problems. Only Jones experienced these supposed behavioral problems and was unable to control Carolyn.

CONCLUSION
Hall's testimony described the gaining of precocious knowledge of sexual conduct as child "sexual abuse." Dr. Stanley disputed this characterization as sex abuse, as does Mississippi's legal definition of the term. There was no sexual contact "performed with or on the child" as defined in M.R.E. 803(25) or "upon" the child as defined in Miss.Code. Ann. § 43-21-105(m) (1972). The evidence was insufficient to establish that it was Carolyn's precocious sexual knowledge supposedly due to witnessing her mother and stepfather's sexual activity which caused Carolyn's behavioral problem and constituted a material change in circumstances. None of Jones' seven other allegations in the complaint were proved to substantiate an adverse effect on the child, a necessary showing to change custody. There is no other factor testified to by any witnesses that warrants a change in custody. To the contrary, however, Dr. Stanley's substantial testing of the father showed he had severe problems with parenting skills as well as conveying his stress to Carolyn.
The only basis for change of custody was the unusual knowledge of sexual conduct presumably witnessed by the child without the knowledge of her mother or stepfather. This Court holds that the chancellor was manifestly in error in changing custody of Carolyn. Evidence of child sex abuse on or with the child is not established by this record, nor is any other adverse circumstance attributable to Smith shown to justify a change of Carolyn's custody.
There was insufficient evidence that the change of custody was in Carolyn's best interest, nor was the change based on the prerequisites of relevant case law. This Court, as in Ballard, finds that the evidence in this case was insufficient to change custody. Additionally, as in Phillips, we find it apparent that, based on Hall's opinion, the chancellor's sole reason for changing custody was to punish Smith for acts the chancellor mistakenly considered to be sexual abuse of Carolyn and to which he disapproved. The acts, even if true, were not child "sexual abuse." This Court, while not condoning Smith's behavior, if true, finds her actions to be mere oversight reflecting poor judgment in allowing Carolyn to "possibly" witness the private sexual activities of Smith and her husband. We also find that this was a circumstance easily correctible, had the chancellor followed all of Dr. Stanley's suggestions. The overall evidence indicated Smith's care of Carolyn was very good and that *492 Smith was a fit and suitable parent. We continue to follow our precedential cases and will disallow a change of child custody without sufficient proof that a child's overall circumstances and living conditions, have been adversely effected posing a detriment to the child's well being and best interest both at present and in the foreseeable future and is not likely to change.
Therefore, finding manifest error, this Court reverses and renders the chancellor's award of primary care and custody of Carolyn to Jones.
REVERSED AND RENDERED.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE and JAMES L. ROBERTS, Jr., JJ., concur. DAN M. LEE, P.J., dissents with separate written opinion.
DAN M. LEE, Presiding Justice, dissenting:
Because I believe the majority employs the wrong standard in determining whether it was proper for the chancellor to change the custody of Carolyn Smith from her mother to her father, I respectfully dissent. The testimony of Mary Jones Smith and Glen Smith (Carolyn's stepfather) is sufficient to warrant the chancellor's determination that there was substantial evidence adduced at trial to warrant a change in custody. Because there was sufficient evidence adduced at trial to support the modification of custody, I would affirm the chancellor's decision. Therefore, I respectfully dissent.

STANDARD OF REVIEW
This Court will not overturn the decision of a chancellor in domestic cases when those findings are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, or the chancellor applied an erroneous legal standard. Crow v. Crow, 622 So.2d 1226, 1228 (Miss. 1993); Gregg v. Montgomery, 587 So.2d 928, 931 (Miss. 1991). As a result of our deferential standard of review given to chancellor's findings, the chancellor's findings will only be overturned if they are manifestly wrong. Whitworth v. Kines, 604 So.2d 225 (Miss. 1992); Wing v. Wing, 549 So.2d 944 (Miss. 1989).

THE LAW

MODIFICATION OF CHILD CUSTODY
Our law, with regard to a modification of a decree for child custody, is well settled. This Court's standard for modification of child custody is found in Ash v. Ash, 622 So.2d 1264 (Miss. 1993). First, the moving party must prove by a preponderance of the evidence that, since entry of the judgment or decree sought to be modified, there has been a material change in circumstances which adversely affects the welfare of the child. Id. at 1265. Second, if such an adverse change has been shown, the moving party must show by like evidence that the best interest of the child requires the change of custody. Id. at 1266. The majority in the case sub judice argues that the chancellor's decision was manifestly wrong because John Jones did not demonstrate that Mary Jones Smith and Glen Smith were physically sexually abusing Carolyn. It has never been my understanding of our law that the party seeking modification of custody had to demonstrate that the child had been physically sexually abused.
I would suggest that it is not necessary for John Jones to demonstrate that Carolyn was physically or sexually abused in order for him to gain custody of his daughter. It was only necessary for John to show, by a preponderance of the evidence, that there had been a material change in circumstances which adversely affected the welfare of Carolyn, and that the best interest of the child required that the change in custody be made. Ash, supra.
The wisdom of the chancellor's decision to modify Carolyn's custody is apparent when we consider the following colloquy between Mary Jones Smith and John's attorney during the trial.
Q. And at times, especially since April of 1990, you've had sexual intercourse and other sex [sic] contact with Mr. Smith at times when your daughter was in the room with you, have you not?
A. Repeat yourself.

*493 Q. You have had sexual contact with Mr. Smith or isn't it true that you've had sexual contact with Mr. Smith, and by "sexual contact," I mean sexual intercourse and oral sex and other forms of sexual contact 
A. I understand that part.
Q.  since April 25 of 1990, at a time when Carolyn Smith was in the room with you, haven't you?
A. Not till after we were married.
Mary Jones Smith further testified that she and Glen engaged in physical fights in front of Carolyn. The following exchange took place between Mary and John's attorney.
Q. Well, it's true that you have physical fist fights on a regular basis is it not?
A. Pushing and shoving, yes.
Q. And hitting?
A. Not on a regular basis, though.
... .
Q. Tell me, at this time, how often, on the average, you recollect those fist fights between you and him to have been?
A. You're wanting to know what? You're wanting to know how often?
Q. Yes, on the average.
A. Maybe once every two weeks. I  I don't know. Maybe once a month, maybe once every two months. I did not keep a record of it.
Q. Now, these are in the presence of Carolyn, more importantly, aren't they?
A. On occasion they have been, yes, sir.
Q. Naturally, very upsetting to the child?
A. Sometimes  she would be scared that he would hurt me.
Q. Has he hurt you?
A. Plus, she didn't realize that I was protecting myself.
... .
Q. And isn't true that, when you have these fights, that it upsets Carolyn and she cries or just goes into hysterics sometimes?
A. I wouldn't say hysterics. She cries.
Mary also testified that she and Glen frequently get into swearing matches in front of Carolyn. In later testimony, when questioned further about having sex in Carolyn's presence, Mary testified as follows.
Q. Okay. Do you know how many times that you've had sexual relations while she (Carolyn) was in the room?
A. No, I don't
Q. Do you have an estimate?
A. Maybe two times. I  I don't know.
... .
Q. Now, would you tell the Court whether or not you were on top of the covers or under the covers?
A. Under the covers, always.
Q. Where was Carolyn?
A. She'd usually sleep down at the end of the bed or just, you know 
Q. On the end of the bed?
A. On the end of the bed. Sometimes, when Glen wouldn't be home and he was working 11:00 to 7:00 in the morning, she would sleep beside the bed by me, because she felt, you know, better like that.
Q. Is this on the floor?
A. Yes.
... .
Q. How do you  do you know whether or not she was asleep when this happened?
A. Yes, I do know that.
Q. How do you know that, Mary?
A. Because my child is a sound sleeper. I mean, she can wet the bed and still stay asleep at night. She won't even know she's wet the bed until I wake her up in the morning time.
On cross-examination, when asked about having sex while Carolyn was in the room, Mary testified as follows.
Q. Your testimony here is you've had what all different kinds of sex with your husband, while your daughter was in the bedroom asleep?
A. Just the regular.
Q. Intercourse?
A. Yeah.
Q. No oral sex?

*494 A. I don't remember. Do you remember when you had  what you do all the time?
THE COURT: You can't ask the questions now. He'll ask the questions.
A. Yes, sir. I'm sorry.
Q. You don't remember just any of the peripherals? You don't remember if it was intercourse or oral sex or what kind of sex it might have been; but you remember specifically it was only two times?
A. I did not specifically say two times. I told you I was not sure.
Q. Well, it could have been many more than two, then, couldn't it, if you're just not sure?
A. I'm not sure.
Q. And you don't dispute that it could have been considerably more?
A. It could have been three times. I don't keep a record of it.
Q. Four times?
A. I don't know.
Q. Could have been?
A. I don't know.
Q. Oral sex?
A. Very rarely, I'll put it that way.
Q. Well, it could have been, couldn't it?
A. I don't like it, sir.
... .
Q. You've had oral sex with your husband, while your daughter was in the bedroom, haven't you?
A. Possibly. I  I may have. I don't know.
... .
Q. Please understand that it is not my intent to upset you or to embarrass you. I just simply want to get at what you know; and I want to know whether or not you can be positive as to whether or not you've had oral sex, while your child was in the bedroom with you?
A. I may have, sir. I  I  you know, I think I did. I don't really remember.
Glen Smith's testimony was similar to Mary's testimony. He testified that he and Mary had had sex while Carolyn was in the room but that Carolyn was always on the floor during these sessions. Glen did testify that Carolyn was asleep and did not see the couple having sex. However, Glen's testimony as to how he knew Carolyn was asleep during the couple's sexual trysts is inconsistent and it is entirely possible that the chancellor could have determined that Glen and Mary could not be sure that Carolyn was always asleep during their lovemaking. Glen denied that they had engaged in oral sex while Carolyn was present in their bedroom.
When considering the totality of the circumstances, it is apparent that the chancellor's decision to grant custody of Carolyn to her father was not manifestly wrong. Tucker v. Tucker, 453 So.2d 1294, 1297 (Miss. 1984), citing Kavanaugh v. Carraway, 435 So.2d 697, 700 (Miss. 1983). First, the evidence showed by a preponderance that there had been a material change in circumstances which adversely affected the welfare of the child. Second, John demonstrated that the best interest of the child required the change of custody. Pace v. Owens, 511 So.2d 489, 490 (Miss. 1987).
In the case sub judice, we cannot say that the evidence did not show by a preponderance that Mary and Glen engaged in sexual intercourse and oral sex in Carolyn's presence. The testimony was such that Mary Smith and Glen Smith both testified that they had engaged in sex while Carolyn was in their room. Mary Jones Smith testified that she and her former husband, John Jones, had not had sex in Carolyn's presence during their marriage. Carolyn has gone from a family situation in which her parents did not have sex in her presence to a situation where her mother and stepfather admitted that Carolyn was in their bedroom on several occasions when they engaged in sexual activities.
The testimony put on by John certainly demonstrated that it was in Carolyn's best interest to remove her from the environment she was exposed to while living with her mother and stepfather. In addition to the evidence of sexual misconduct, John put on evidence to show that Mary and Glen engaged in frequent physical brawls in Carolyn's presence; that these fights frightened *495 Carolyn and caused her to cry; and that Glen and Mary engaged in frequent verbal disputes that turned into swearing matches. This too was done in Carolyn's presence. When these factors are combined, it is apparent that the Smiths engaged in a continuous pattern of misconduct that threatened the well-being of Carolyn Jones. Therefore, it is evident that John demonstrated that it was in Carolyn's best interest to remove her from such a damaging environment.
The evidence established at trial showed that John Jones and his new wife, Shirley Jones, are loving, caring parents, that are genuinely concerned about Carolyn's well-being. The Joneses are, for all practical purposes, a stable couple, and it appears that Carolyn has responded quite well to living with her father and new stepmother. The Joneses regularly attend church with Carolyn and have displayed an active interest in Carolyn's progress in school. It is evident to me that the chancellor correctly decided that John Jones should have custody of his daughter.

CONCLUSION
The majority argues that Carolyn's exposure to Mary and Glen's sexual activities was inadvertent. However, the testimony clearly shows that the couple engaged in sex on more than one occasion while in Carolyn's presence and it appears that, on at least one occasion, the couple had sex while Carolyn was at the foot of the bed. Mary could not testify to the exact number of times that she had had sex in Carolyn's presence, but seemed to indicate that she and Glen might have engaged in sex at least four times in Carolyn's presence. The Smith's sexual conduct is but one element among many that establish their continuing misconduct in the presence of Carolyn. Glen and Mary's decision to initiate and conduct sexual relations while all the time knowing that Carolyn was present in their bedroom is inexcusable. One time may be inadvertent, but repeated instances of sexual activity in Carolyn's presence goes far beyond inadvertence. Therefore, when we consider the "totality of the circumstances," it is evident that the chancellor was correct in modifying Carolyn's custody and thus, I would affirm the chancellor's order.
Accordingly, I respectfully dissent.
NOTES
[1] The names of the parties to this case, as well as the names of other individuals involved, have been changed to protect the anonymity of the parties' minor child.
[2] Jones alleged that custody of Carolyn should be placed with him because:

(1) Since the divorce he has seen beer at Smith's residence on three different occasions;
(2) Smith has used numerous babysitters;
(3) Smith has a violent temper;
(4) Jones has witnessed physical confrontations between Mary and Glen Smith;
(5) Jones alleges that Smith degrades him and uses bad language;
(6) Carolyn has a precocious knowledge of human sexual behavior as testified to by Hall;
(7) Jones has a better Christian atmosphere in his home; and
(8) On many occasions when he would receive Carolyn for visitation, her hair and clothes would be dirty, and sometimes her clothes would be too small.
[3] Under Mississippi's Youth Court Law, an "abused child" is defined as follows:

"Abused child" means a child whose parent, guardian or custodian or any person responsible for his care or support, whether legally obligated to do so or not, has caused or allowed to be caused upon said child sexual abuse, sexual exploitation, emotional abuse, mental injury, nonaccidental physical injury or other maltreatment. "Sexual abuse" includes obscene or pornographic photographing, filming or depiction of children for commercial purposes, or the rape, molestation, incest, prostitution or other such forms of sexual exploitation of children under circumstances which indicate that the child's health or welfare is harmed or threatened. However, any child who in good faith is under treatment by spiritual means alone through prayer in accordance with the tenets and practices of a recognized church or religious denomination by a duly accredited practitioner thereof shall not, for that reason alone, be considered to be abused under any provision of this chapter, unless the judge shall find that it is in the best interest of the child for the court to take jurisdiction.
Miss. Code Ann. § 43-21-105(m) (1972) (emphasis added). Though this is not a Youth Court case, this Court notes that Carolyn would not be considered an "abused child" under the above enumerated statute.
[4] M.R.E. 803(25), the tender years exception is not applicable to the instant situation because the statements involved are not ones describing any act of sexual contact performed with or on the child by another.
[5] The complaint listed eight allegations by Jones that he believed justified the chancellor finding that a material change in circumstances had occurred that warranted changing custody of Carolyn. The chancellor found only Item (6), "the precocious sexual knowledge" of Carolyn constituted the material change in circumstances.