**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 1999-CA-00484-SCT**

*GARY LONGANECKER AND*

*COELLA LONGANECKER,*

*INDIVIDUALLY AND DERIVATIVELY*

*v.*

*DIAMONDHEAD COUNTRY CLUB AND PROPERTY OWNERS ASSOCIATION, INC.;*
*JAMES F. VAN NORMAN, AS PRESIDENT; THE BOARD OF DIRECTORS OF THE*
*PROPERTY OWNERS ASSOCIATION; MEMBERS OF THE BOARD OF DIRECTORS OF*
*THE PROPERTY OWNERS ASSOCIATION, BEING JUDITH STAHL, KEN KIPPING,*

*MARY G. SINDERS, BRIERLEY ACKER,*

*PAUL GUICHET, E. GEORGE CASSIS, CHARLES BUTLER, ALYWYNN J. CRONVICH,*
*PETER J. CASANO AND JIM HOURIN*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/12/1999 |
| TRIAL JUDGE: | HON. THOMAS WRIGHT TEEL |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | DEREK ARTHUR WYATT |
| ATTORNEYS FOR APPELLEES: | JOSEPH R. MEADOWS |
| | KAREN J. YOUNG |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 06/15/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 7/6/2000 |

**BEFORE BANKS, P.J., WALLER AND DIAZ, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. Gary and Coella Longanecker brought suit in the Hancock County Chancery Court both individually and derivatively against the Diamondhead Country Club and Property Owners Association, Inc., its officers and directors (collectively the "Association"), claiming that the Association had violated Miss. Code Ann. § 79-11-177 (1996), by unequally assessing security fees to resident and non-resident property owners. The Longaneckers sought an order requiring the Association to comply with the corporate statutes, an accounting and an award of the actual amount of security fees that were allegedly wrongfully collected, and

an award of punitive damages in the amount of at least three times the actual damages award, as well as interest, fees, and costs.[1] Following a non-jury trial, the chancellor ruled that the Longaneckers could not bring suit derivatively as individual shareholders under Miss. Code Ann. § 79-11-193 (1996), and had no standing to sue derivatively as directors because of their failure to make demand on the corporate directors prior to filing suit. In addition, the chancellor gave a judgment in favor of the Association after finding that it had not violated the laws or acted in bad faith. The Longaneckers have appealed to this Court raising the following issues:

**I. Whether the Chancellor erred in considering the Longaneckers' standing when lack of standing was not pled as an affirmative defense or raised as an issue until close to the time of trial.**

**II. Whether the Chancellor erred in finding that the Association had not violated Miss. Code Ann. § 79-11-177 by creating different classes of members or unequally assessing fees.**

**III. Whether the Chancellor erred in finding that the Association did not violate a restrictive covenant requiring all fees to be equally assessed.**

**IV. Whether the Chancellor correctly allowed extrinsic and parol evidence and evidence of alleged settlement negotiations to challenge the Longaneckers' assertion that the Association had, in essence, made an admission of wrongdoing.**

Finding no reversible error, we affirm.

## STATEMENT OF THE FACTS

¶2. The Diamondhead Country Club and Property Owners' Association, Inc., originated in 1970 as the governing authority for the property owners of Diamondhead, Mississippi. Although it now has over 4,290 members, Diamondhead is not an incorporated city or town. Of its members, 1,848 maintain their primary residence in Diamondhead. The Diamondhead community currently consists of houses and condos, streets, a fire station, two golf courses, a tennis club, a yacht club, swimming pools and playgrounds, and a private security force. At one time, Diamondhead also had a stable, campgrounds, and a private school. It operates as a small town. The Association is a non-profit corporation, with each property owner having one share of stock in the corporation. The corporation has bylaws, annual meetings, a board of directors and officers, and meets all the other requirements of Mississippi corporate law. The Diamondhead community is further controlled by the restrictive covenants filed in the land records in 1970.

¶3. The members (the Mississippi Nonprofit Corporation Act's equivalent to shareholders under the Mississippi Business Corporation Act) of the Association are assessed fees, which they can pay on a monthly or annual basis, to maintain their community and common areas. The members also pay user fees for some of the available amenities.

¶4. In 1992, Gulf Coast Security Services, Inc., which provides security services for the Association and its members, requested a 12% pay increase. Concerned that the Association could not handle such a substantial increase based on the income from its current dues, then-president Peter Casano inquired about the possibility of charging additional fees to the members for security. More particularly, he asked the attorney who had drafted the covenants about the possibility of such an action. The attorney responded in writing that the restrictive covenants, which stated that all charges and assessments shall be on an "equal

basis," did not necessarily mean that every member must pay the same amount, but that the imposition of the fees and assessments should be equitably and rationally applied. Acting on that advice, the Board of Directors voted in November of 1992 to charge a monthly security fee of $5.00 per homeowner and $3.00 per condominium owner beginning in January of 1993. There was no additional fee imposed to owners of unimproved lots. The monthly bills sent to members contain the word "security" as a separate item, and do not indicate the nature of the fee in any other words.

¶5. Although there was some dissension among the members, no one actually came to the Board with any proof that the fee was unlawfully imposed or that a suit would be filed if the Board did not act to eradicate any inequality.

¶6. The Longaneckers filed this suit on June 3, 1996. Coella Longanecker was elected to the Board on June 15, 1996, and took office on June 19 of that year. On June 20, 1996, the Longaneckers filed an amended complaint incorporating their original complaint, and adding only a verification that the information contained therein was true to the best of their knowledge.

## STANDARD OF REVIEW

¶7. "This Court will not reverse a Chancery Court's factual findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence in the record supporting these findings of fact." *Smith v. Jones*, 654 So. 2d 480, 485 (Miss. 1995) (quoting *Cooper v. Crabb*, 587 So. 2d 236, 239 (Miss. 1991) ). Furthermore, the chancellor's findings will not be disturbed when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous or applied an erroneous legal standard." *Williams v. Williams*, 656 So. 2d 325, 330 (Miss. 1995); *Smith*, 654 So. 2d at 485; *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994), *quoted in* **Brocato v. Brocato**, 731 So. 2d 1138, 1140 (Miss. 1999).

## DISCUSSION

**I. Whether the Chancellor erred in considering the Longaneckers' standing when lack of standing was not pled as an affirmative defense or raised as an issue until close to the time of trial.**

¶8. This issue involves the application of Miss. Code Ann. § 79-11-193 (1996), which provides for the bringing of derivative actions. The statute reads as follows:

(1) A proceeding may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor by:

(a) Any member or members having five percent (5%) or more of the voting power or by fifty (50) members, whichever is less; or

(b) Any director.

(2) In any such proceeding, each complainant shall be a member or director at the time of bringing the proceeding.

(3) A complaint in a proceeding brought in the right of a corporation must be verified and allege with

particularity the demand made, if any, to obtain action by the directors and either why the complainants could not obtain the action or why they did not make the demand. . . .

Miss. Code Ann. § 79-11-193. Because the quoted statute involves two distinct issues, both standing and demand, we will address them separately and in turn.

### A. Standing

¶9. The Association claims that the Longaneckers lacked standing to bring this derivative action. The Longaneckers have only one share of the corporation, and thus do not have the requisite five percent or more voting power to bring suit under § 79-11-193(1)(a). For purposes of having standing as a director under § 79-11-193(1)(b), Gary Longanecker has never been a director of the corporation, but Coella was elected to the Board a mere 12 days after the filing of this suit. The Longaneckers point out that they made a supplemental pleading a day after Coella took office as a director. The Association, however, relies on M.R.C.P. 15(c), which states that an amended pleading relates back to the filing of the original pleading. The chancellor, finding that Rule 15(c) did not address supplemental pleadings, chose to ignore the issue of standing on this basis.[2] He did, however, go on to find that Coella had derivative standing as a director, but neither of the Longaneckers had individual, derivative standing. The chancellor specifically quoted:

> We adopt the rule in Mississippi that an action to redress injuries to a corporation, whether arising in contract or in tort cannot be maintained by a stockholder in his own name, but must be brought by the corporation because the action belongs to the corporation and not the individual stockholders whose rights are merely derivative.

*Bruno v. Southeastern Servs., Inc.*, 385 So. 2d 620, 622 (Miss. 1980). The Longaneckers have not appealed the issue of derivative standing in their capacity as individual shareholders.

### B. Demand

¶10. The Association also claimed at trial and on appeal that the Longaneckers could not maintain their suit because they failed to make demand on the corporation or explain why such demand would be futile prior to filing suit. The Longaneckers claim that the Association waived any objection to the derivative nature of this action by failing to raise it as an affirmative defense in its answer or by failing to raise it until the eve of trial. In fact, the Longaneckers go so far as to say that the Association admitted their derivative status in its answer, by admitting to the complaint paragraph titled "Parties" which alleged that the action was brought derivatively. In fact, however, the complaint also alleged, in Paragraph 14, that, "Defendants and counsel employed by the Defendants have been advised verbally and in writing of the failure and/or refusal to comply with the Mississippi Non-Profit Corporation Act." That allegation is denied in the Association's answer. The chancellor thus concluded that the Longaneckers were on notice that this would be an issue at trial, thus there was no waiver. The chancellor acknowledged that this Court has held that failure to object to procedural requisites may constitute a waiver of those objections, *see Derouen v. Murray*, 604 So. 2d 1086, 1091 (Miss. 1992), but it found that there was no waiver in this case. The chancellor's decision on this issue is not manifestly erroneous. For example, other courts have held that where a plaintiff alleged futility, and that allegation was denied in a responsive pleading, there had been no waiver, even though the failure to make demand was not raised as an affirmative defense. *Renz v. Carota*, No. 87-CV-487, 1991 WL 165677, *2 (N.D.N.Y. 1991), *aff'd mem. sub nom. Renz v. Beeman*, 963 F.2d 1521 (2d Cir. 1992). In this case, the Association denied that demand had been made, and it filed a motion to dismiss for

failure to make demand prior to trial. The chancellor's conclusion that it had not waived the defense of failure to make demand is therefore not erroneous.

¶11. The chancellor further concluded that the Longaneckers had failed to make demand as required by statute. The chancellor unfortunately cited the statute pertaining to limited liability companies which requires that demand be made in writing 90 days before suit is filed. The Mississippi Nonprofit Corporation Act, Miss. Code Ann. §§ 79-11-101, et seq. (1996 & Supp. 1999), which governs the present suit, however, does not contain any procedural formalities which must be followed, but only, as quoted in the statute above, that the complaint "allege with particularity the demand made . . . or why they did not make demand." Miss. Code Ann. § 79-11-193(3) (1996).

¶12. The chancellor did find that the directors had some notice in that "the security issue was certainly known and discussed informally and at some gatherings with board members." Several of the witnesses for the Longaneckers testified that they had talked with one or more of the directors about the inequality of the assessed fees in informal settings. No one, however, had actually attended a board meeting with a complaint. The chancellor stated:

> Having looked, the Court finds no clear definition of "demand" in the pertinent statutes; however, in Black's Law Dictionary (5th ed. 1974), the most appropriate definition is that demand is an "imperative request preferred by one person to another, under a claim of right, requiring the latter to do or yield something or to abstain from some act." As such, demand is not just notice, but formal notice with consequences.

The chancellor is correct in noting that there is a dearth of case law or statutory guidance concerning what is required in making a demand on a nonprofit corporation. As cited by the chancellor, the limited liability company statutes and the business corporation statutes require written demand and a 90 period to allow the corporation to act on the demand before a derivative action is allowed to proceed. *See* Miss. Code Ann. §§ 79-4-7.42 & 79-29-1102 (1996). Our sister state of Tennessee, which has very similar statutes to ours, has held that demand upon a non-profit corporation should mirror demand required on a regular business corporation. ***Burke v. Tennessee Walking Horse Breeders' & Exhibitors' Assoc.***, No. 01A01-9611-CH-00511, 1997 WL 277999 (Tenn. Ct. App. 1997). Tennessee uses its business corporation act's requirement of written demand prior to filing suit to likewise apply to demand on a nonprofit corporation. The court concluded that "[t]he foregoing rules for ordinary corporations apply with even greater effect in regard to not-for-profit corporations in which there are no stockholders holding a property interest to suffer loss as a result of corporate action." Similarly, Georgia's nonprofit corporation statutes require a written demand. *See* Ga. Code Ann. § 14-3-742 (1991). The official comment to the Model Nonprofit Corporation Act, on which Mississippi's statutes are based, sets out the purpose of the demand rule, stating, "[t]he demand allows the directors to investigate the claim and to act on behalf of the corporation if they find that action is warranted." Revised Model Nonprofit Corp. Act § 6.30 cmt. (1988).

¶13. The chancellor's finding that the Longaneckers failed to make demand is supported by substantial evidence. Indeed, Gary even admitted in his testimony that no written demand was ever made on the Association. Given that generally derivative plaintiffs must make written demand, informal discussions among the subject members here appear to be inadequate. For example, the Ninth Circuit upheld the dismissal of a suit against a non-profit corporation where demands were made to the president/director and general counsel of the corporation, which that court found were not comparable to the board of directors,

as required by Fed. R. Civ. P. 23.1. *Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1209 (9th Cir. 1980). Similarly, in this case, the Longaneckers made no demand to the Board of Directors as a whole. The chancellor in this case said, "this lawsuit was the only demand ever made. To find otherwise would require all such boards to see any letter or conversation as a demand." This is especially true in light of the stated goal of demand, which is to allow the corporation to take action to prevent divisive legal proceedings. In light of the purpose of demand, we hold that demand requires some meaningful opportunity for the directors to act after learning of a threat of suit on the issue. The chancellor's findings and judgment are not clearly erroneous. The Longaneckers lacked standing to sue derivatively for their failure to make demand; and therefore, the chancellor did not err in granting judgment in favor of the Association.

### II. Whether the Chancellor erred in finding that the Association had not violated Miss. Code Ann. § 79-11-177 by creating different classes of members or unequally assessing fees.

¶14. Miss. Code Ann. § 79-11-177 (1996) provides:

> All members shall have the same rights and obligations with respect to voting, dissolution, redemption and transfer, unless the articles or bylaws establish classes of membership with different rights or obligations. All members shall have the same rights and obligations with respect to any other matters, except as set forth in or authorized by the articles or bylaws.

¶15. The Longaneckers argue that this Court is faced with an issue of first impression in interpreting this statute. The Longaneckers further present this Court with various rules of statutory construction to aid their interpretation. The Association counters that there is no issue of statutory interpretation here. A plain reading of the statute reveals that an assessment for security fees does not affect voting, dissolution, redemption or transfer. As to the "other matters" clause, the bylaws give the directors the responsibility of handling "guard and security service" at Diamondhead, and also authorizes them to approve the charging of "dues or special assessments." The Association concludes that their actions do not amount to a creation of classes of members, nor are their actions prohibited under the above quoted statute.

¶16. The Longaneckers correctly assert that there have been no cases interpreting this provision of the Nonprofit Corporation Act. The official comments to the Model Act, however, do provide some guidance on this issue:

> The articles or bylaws may authorize any person, group or committee to establish different rights and obligations for different members unless different rights and obligations would create a separate class of members.

> The differences may relate to dues, assessments, transfers of memberships in mutual benefit corporations, use of facilities, termination or suspension of members, voting, distributions on dissolution of mutual benefit corporations and other factors. Distinctions can be made between individual, corporate and other entities that are members of the corporation. These distinctions between members can be based on size, net worth, number of employees, activity and other factors. These distinctions do not necessarily result in classes having the right to vote separately on matter requiring a member vote. . . .

Revised Model Nonprofit Corporation Act § 6.11 cmt. It is clear, then, that the drafters of the Model Act, adopted verbatim in Mississippi, contemplated a situation just as this where nonprofit corporations would

charge different dues or fees, and those distinctions are rationally based on some of the factors mentioned. At least one other state, Pennsylvania, has a statute that specifically allows for different fees to be assessed against members of the same class in a non-profit corporation. *See Anderson v. Colonial Country Club*, 739 A.2d 1118 (Pa. Commw. Ct. 1999). Also of persuasive value, the State of Washington has considered a case very similar to the case sub judice in which members of a nonprofit homeowners' association claimed that the association had created different classes of members by charging different dues for owners of improved and unimproved lots. *Ackerman v. Sudden Valley Community Ass'n*, 944 P.2d 1045 (Wash. Ct. App. 1997). In that case, the Court of Appeals of Washington held that the two-tiered system of dues based on the unimproved/improved lot distinction did not create different classes of members in violation of the nonprofit corporation's articles of incorporation, which provided that assessments be levied against members in equal amounts. *Id.* at 1048. First, the court found that the association, under the restrictive covenants, was charged with charging its members on an equitable basis to maintain the common facilities, and that "equitable" could certainly include a dues system based on improvement or non-improvement of lots. *Id.* at 1049. The court then looked to the articles of incorporation of the association, which included a provision that there should only be one class of members of the corporation. *Id.* at 1051. The court concluded:

> Ownership of an improved or an unimproved lot, as in the instant case, however, is not the type of distinguishing feature that would set different classes of members apart. One is not "elected" or "appointed" to owning an improved lot as compared to an unimproved lot. Moreover, the amount of assessment paid by one member as compared to the amount paid by another does not inhere in lot ownership or club membership, and is not a distinguishing class feature. Similarly, one is not a different class of citizen in this country merely because one pays more or less in taxes to the government than another citizen may.

*Id.* at 1051-52.

¶17. Similarly in this case, the different assessments did not create different classes of members. The distinction was rationally based on the purpose of the fee, i.e., owners of improved lots are more likely to use and need the benefits of security than owners of unimproved parcels of land. The distinction did not affect the other rights or obligations of the members in any way.

¶18. The chancellor concluded similarly that there was no statutory violation and that the charging of the security fees in this case did not implicate any class or member voting requirements. The chancellor's opinion on this issue is based on substantial evidence and is not manifestly erroneous. Therefore, we affirm on this issue.

### III. Whether the Chancellor erred in finding that the Association did not violate a restrictive covenant requiring all fees to be equally assessed.

¶19. Under this assignment of error, the Longaneckers assert that the Association has violated the restrictive covenants. The Longaneckers correctly note that covenants for the creation of property owners associations and its attendant purposes, including the assessment of fees and charges to maintain common areas, are covenants that run with the land and are binding on the original parties as well as subsequent owners. Property owners associations compel membership of all homeowners under the restrictive covenants. *Perry v. Bridgetown Community Ass'n, Inc.*, 486 So. 2d 1230, 1232-33 (Miss. 1986). The Diamondhead covenants state that "all charges and assessments . . . shall be applied to each lot/or person

governed hereby on an equal basis." The Longaneckers argument is basically that equal means equal, and all property owners/members should pay the exact same amount in dues. The Association, however, says that equal actually means equitable. The Association points out that there are all sorts of "user" fees charged to members, and this security fee is no more than that, not an additional membership fee.

¶20. The chancellor's opinion reads:

21. Notwithstanding the chosen verbiage of the parties, this case is about taxation. Whether one characterizes the monetary cost as a charge, a fee, an assessment, it is still a tax. The difference is a matter of classification, of semantics, and of politics.

Indeed, as to the latter, the Court heard a myriad of complaints about this and former POA boards . . . . These are the issues of any healthy, representative democracy; however, a property owner's association is not a democracy, it is a non-profit corporation, controlled by contracts, covenants and by-laws. It is also, perhaps, a poor vehicle to govern what effectively is a small city.

22. Reading the declarations as a whole and reading these with a *Griffin* "reasonableness," the Court finds no clear support for either side.

23. Certainly, lot owners have to be assessed equally under the declarations; however, those same declarations lump common recreational areas and security into matters that the POA board will manage. Necessarily, there can only be two interpretations: (a) there are, *at least*, two types of assessments (user fees and member/lot fees), or (b) there is only one type of taxation, lot fees which pay for all amenities. Here, both sides assert the former. In particular, the Longaneckers assert that costs associated with the yacht club, golf club, and tennis club are user fees while the security costs are unequal lot assessments. Their argument, like Defendants, is pure conjecture. The declarations do not offer definition or guidance.

24. *Arguendo*, if the Longaneckers are correct, a strong argument could be made that any common activity must be generally and equally assessed, whether golf or tennis or security. In other words, as common amenities, the assessment of golf would be generally assessed regardless of how much one plays, and the assessment for a marina slip would be generally assessed irregardless or one's owning a boat or the size of the slip. In other words, one could argue that all amenities are common and free.

25. *Arguendo*, if the Longaneckers are correct, the Court could not grant them the relief sought. Beyond the technical arguments, since no demand was made and the board has since eliminated the separate security charge, the Court would not have sufficient evidence to rule. If it is an unequal lot assessment, it does not necessarily follow that the assessments be remitted, only equalized. Logically, this can be done by making the condominium owners pay an additional $2.00 per period and the vacant lot owners pay $5.00. The Court has no information on how to equalize this except Mr. Casano's testimony that the security fee did not cover even 40% of the overall costs.

26. The Court finds that the declarations are, therefore, unclear. Using the reasoning of *Griffin v. Tall Timbers Development, Inc.* [681 So. 2d 546 (Miss. 1996)], the Court finds that the Plaintiffs have not produced sufficient proof to establish the POA board can not differentiate between charges that are user related and equitably assessed and those charges that are related to membership-lots and equally assessed. The Court notes that the stated reason for graduated security charges was the

qualitative difference in policing a home, a condominium, and a vacant lot. The Court further notes that some equitable taxing in property owners' associations is contained in the Uniform Common Interest Ownership Act § 3-115 (1894). [The Chancellor noted by footnote that this example is purely illustrative since Mississippi had not adopted the Act.]

¶21. The covenants make it clear that the Association is charged with maintaining common areas, and may do so by charging fees, as long as those fees are charged to the members on an equal basis. An equal basis, as indicated by the chancellor in this case, is not clear and subject to differing interpretations. What is clear is that the members of the Association are often charged fees based on differing criteria and that all of those charges are lumped together in a single billing. The Association has different distinctions for assessing fees, including some user-based fees, a one-month discount for those who opt for annual payment of fees, a waiver of fees for contiguous lots. These are just some examples of situations in which the members of the Association do not pay the exact same fee. Yet none of these charges have ever been challenged. There is no evidence that the fees charged for security were not put to that use; indeed, Casano testified the fees charged amounted to no more than 40% of the cost of security. There is no credible evidence that the Association lacks the power to make the assessments at issue in this case, or violated any covenant or law in doing so. Therefore, there is no merit in this issue.

> **IV. Whether the Chancellor correctly allowed extrinsic and parol evidence and evidence of alleged settlement negotiations to challenge the Longanecker's assertion that the Association had, in essence, made an admission of wrongdoing.**

¶22. Coella contacted the Board in writing in September of 1996, several months after the present lawsuit was filed wherein she discussed the possibility of settling the suit. In an October 3, 1996, meeting, the Board voted to rescind the security fees at issue in an attempt to settle the case. Coella prepared the Board minutes herself, which stated that "motion made by Sibley that the POA will comply with Mississippi State Statute 79-11-177, effective January 1, 1997." The Longaneckers argued at trial that the Board minutes amounted to an admission by the Association that they had violated the named provision. They now argue on appeal that the chancellor should not have allowed the Association to refute such an assertion by explaining the reasons for the Board's actions in rescinding the imposed security charges. The Longaneckers' argument that the Board minutes are an admission of wrongdoing by the Association is disingenuous. Coella drafted the minutes herself. To hold that the minutes are an admission by the Association would be against all notions of fairness and justice. The chancellor was correct in allowing the directors to testify about their actions. This Court has held that personal knowledge of corporate actions is admissible. *American Tel. & Tel. Co. v. Purcell Co.*, 606 So. 2d 93, 97 (Miss. 1990) (citing 32A C.J.S. *Evidence* § 810). This issue is without merit.

## CONCLUSION

¶23. The Longaneckers failed to make demand on the Association as required by Miss. Code Ann. § 79-11-193. The Longaneckers also failed to bring any other meritorious arguments as to why the judgment of the trial court should be reversed and rendered in their favor. Therefore, the judgment of the Chancery Court of Hancock County is affirmed.

¶24. **AFFIRMED.**

> **PRATHER, C.J., PITTMAN AND BANKS, P.JJ., McRAE, SMITH, MILLS, COBB AND**

**DIAZ, JJ., CONCUR.**

1. The Longaneckers brought this suit styled as a derivative action allegedly to recoup losses on behalf of all of the members who were charged the unequal security fees. A "derivative" proceeding, however, is one that is brought to address harm to a corporation, and not to the corporate shareholders. *See* Miss. Code Ann. §§ 79-11-193 and 79-4-7.40 (1996). Because the Chancellor treated the action as a derivative proceeding, and the Association has failed to appeal with particularity this issue, this Court will continue to address this case as if it were a true derivative proceeding.

2. The comment to M.R.C.P. 15(d), which provides that supplemental pleadings will relate back to the date of original filing, offers some guidance on this question. Since the Chancellor did not directly address this issue, and the demand issue is dispositive, we will not discuss whether Coella should have had standing as a director in any detail.