ISHEE, J., for the Court:
¶ 1. Robert and Jennifer Goudelock filed for divorce in December 2009. The parties had one child during the marriage. In February 2010, a divorce was granted based on irreconcilable differences, and the parties agreed to share joint legal and physical custody of the minor child. In May 2011, pursuant to Jennifer’s petition for modification and contempt, the Union County Chancery Court modified the original divorce decree and granted Jennifer sole legal and physical custody of the minor child. Although Robert had filed a counter-complaint arguing Jennifer was also in contempt, the chancellor declined to find either party in contempt. Robert now *160 appeals arguing the chancellor erred by (1) misapplying the legal standard for modification of child custody, (2) refusing to find Jennifer in contempt, and (8) preventing Robert from participating in the child’s medical decisions. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. On December 4, 2009, Robert and Jennifer filed a joint complaint for divorce. One child, Gunner, was born of the marriage on March 9, 2006. The parties also filed a child-custody and property-settlement agreement. They agreed to joint legal and physical custody of Gunner, with physical custody alternating between Robert and Jennifer on a weekly basis. On February 3, 2010, the chancellor granted the divorce based on irreconcilable differences and incorporated the child-custody and property-settlement agreement.
¶ 3. On August 26, 2010, Jennifer filed a petition for modification and contempt. She alleged a material change in circumstances had occurred and sought sole custody of the child. Jennifer also requested that Robert be required to pay additional child support, and that he be responsible for all transportation for visitation. Finally, Jennifer claimed Robert was in contempt for his failure to get a title or tag for the vehicle awarded to him in the divorce decree.
¶ 4. On September 28, 2010, Robert filed an answer and counter-complaint. He contended that Jennifer was in contempt for violating the original divorce decree because she had failed to consult Robert before taking, Gunner to the dentist, even though the parties shared joint custody. On November 15, 2011, a hearing was held on Jennifer’s petition for modification and contempt.
¶ 5. Morris White, the president of the neighborhood association where Robert lives, was the first witness at the hearing. He testified regarding Robert’s violent propensities. White described an instance in which Robert jumped on the tractor White was driving and then hit White in the head. On another occasion, after White had turned Robert’s water off for failure to pay his bill, Robert told White “he was in the business of killing people, and he would blow [White’s] head off.” White also witnessed Robert riding a four-wheeler through the woods with Gunner in the back basket not wearing a helmet, a dangerous activity due to Gunner’s medical condition — hemophilia.
¶ 6. Athadale Ezzell, one of Robert’s neighbors, also testified during the hearing. She stated that she saw Gunner playing on a pier on a lake near her home alone and unsupervised. According to Ez-zell, while Gunner was on the pier, Robert was mowing the grass; therefore, Gunner was out of Robert’s sight for several minutes at a time. This was especially dangerous because Gunner does not know how to swim. Ezzell also supported White’s testimony by stating that she saw bruises on White after the alleged altercation with Robert.
¶ 7. Robin Smith, Gunner’s therapist, testified regarding her meetings with Gunner. Gunner met with Smith for therapy approximately every other week. Smith said that during their initial consultation she had asked Gunner to draw each parent’s house in the sandbox. In Jennifer’s house, Gunner placed “lots of animals, trees, [and] play things.” In Robert’s house, Gunner placed “a motorcycle and guns, and that was it.” While in therapy, Gunner reportedly was very hesitant to discuss anything related to Robert. However, on one occasion, Gunner asked Smith: “Why does my mommy make me *161 go to my daddy’s?” He also said Robert had told him that “[m]ommy’s leaving him and me” and that he was not allowed to speak with Jennifer when in Robert’s custody.
¶8. During one session, Gunner described an incident in which Robert allowed Gunner to shoot a snake in the yard. Smith took issue with this, particularly because of Gunner’s recent violent outbursts. Smith stated that Gunner “comes back from [Robert’s,] and he’s more agitated and irritable.” She also opined that “week to week is hard on a child because ... they need — especially this young of a child [ — ] a lot of stability, and going from one routine to another and every other week is very hard.”
¶ 9. Lynn Madden, Jennifer’s stepmother, was a witness at the hearing. She testified that she had taken Gunner to Robert’s house to exchange visitation eight to ten times. According to Lynn, Gunner began crying as soon as they put his shoes on and cried all the way to Robert’s house. However, she also acknowledged that Gunner seems to love his father and that Robert has always been pleasant toward her during the exchanges.
¶ 10. Frank Madden, Jennifer’s father, confirmed Lynn’s testimony that Gunner cried the entire way to Robert’s house. Frank also stated that as soon as they approached Robert’s house, Gunner would immediately stop crying. He opined that Gunner was scared of Robert.
¶ 11. Margaret Ray, an employee from the dentist’s office, discussed Gunner’s dental treatments and her interactions with Robert. According to Ray, Robert called the office asking if they had done x-rays on Gunner, and if he could get a copy of the x-rays. She informed him that they had, in fact, performed x-rays and a dental cleaning. Ray said Robert was “a little angry and agitated because we had seen his son without his knowledge.” He even threatened to call his attorney. Ray then acknowledged that on the day of the dental cleaning, Jennifer told the office that she had informed Robert regarding the procedure.
¶ 12. Dr. Kevin Rowan, Gunner’s dentist, testified that during an August 30, 2010 cleaning, he found that several primary and secondary molars had some decay. Due to Gunner’s hemophilia, Dr. Rowan recommended further medical treatment so that the tooth did not have to be prematurely extracted. However, due to Robert’s refusal to allow Gunner to receive treatment in Jackson, Mississippi, Gunner was not treated until March 2011. Based on the delay, Gunner lost a tooth, which Dr. Rowan opined could have been saved. He found Robert’s behavior with regard to Gunner’s dental treatment appalling.
¶ 13. Jennifer recalled several confrontations between herself and Robert. According to her testimony, on one occasion she had wrapped some pictures of Gunner for Gunner to give to Robert for Father’s day. Upon receiving the gift, Robert immediately threw the pictures back at Jennifer in front of Gunner. In a separate instance, during a confrontation with Jennifer, Robert placed Gunner in his vehicle with no air conditioning. This occurred in August, and, as such, the temperatures had reached above ninety degrees. Jennifer estimated that Gunner was left in the vehicle for fifteen minutes. Robert had also accused Jennifer of having an affair during their marriage and questioned whether Gunner was even his child on more than one occasion.
¶ 14. Jennifer testified that Gunner has severe hemophilia, which requires treatments every other day. During one visit with Robert, Gunner was injured by a *162 falling tree that Robert had cut down in the woods. Gunner’s medical condition requires emergency infusions if he sustains severe injuries, like the bruise to his shoulder caused by the falling tree. However, Robert failed to take any medical action. Furthermore, Jennifer stated that upon returning home from visiting Robert, Gunner would often wet the bed and have behavioral problems for several days, which was also referenced in Smith’s testimony. Finally, Gunner does not have a bed at Robert’s house, and he has to sleep in the bed with Robert.
¶ 15. On May 19, 2011, the chancellor entered an opinion and modified the custody arrangement. The chancellor found that there had been a material and substantial change in circumstances adverse to the best interest of the child. When finding a change in circumstances, the chancellor cited that Robert’s refusal to consent to a dental procedure for the child had led to the premature extraction of Gunner’s tooth. Additionally, while in Robert’s care, Gunner had been struck by a tree sapling cut down by Robert. Due to the child’s medical condition, Gunner had severe bruising, but Robert failed to give him an infusion. Further, during an exchange of custody, after observing a man at Jennifer’s house, Robert left Gunner in his vehicle with no air conditioning on for the child. Robert admitted the temperature rose above ninety degrees on the day in question. While the child was unattended in the vehicle, Robert proceeded to confront Jennifer in an aggressive manner. Finally, according to a neighbor’s testimony, Robert left the child unattended on a pier next to a lake. In reaching her decision, the chancellor stated: “While each specific instance cited by Jennifer in support of her petition may not rise to the level warranting a modification of custody, a review of the totality of the circumstances and the cumulative effect upon the child provides clear and convincing evidence in support thereof.” The chancellor then conducted an Albright[1] analysis.
¶ 16. The chancellor found the factor for the age, health, and sex of the child favored Jennifer. Gunner has hemophilia and dental needs which require special attention. The chancellor found Jennifer has consistently provided the requisite medical care, while Robert has failed to do so. The chancellor also found the factor as to which parent has the best parenting skills and which parent has the willingness and capacity to provide primary care also favored Jennifer. Robert has been inattentive to the child’s medical needs and exhibited poor behavior in the presence of the child, whereas, Jennifer has always provided responsible and appropriate care for Gunner. With regard to the stability of the home environment and employment of each parent, the chancellor found the stability of the home environment was neutral, but the stability of employment slightly favored Jennifer because Robert had changed employment more than once since the final decree. All other factors were found to be neutral.
¶ 17. Accordingly, the chancellor found, based on the totality of the circumstances, the best interest of the child was served by modifying the prior decree and awarding sole legal and physical custody to Jennifer. Robert received reasonable visitation. The chancellor awarded additional child support, which increased the payments to $453 per month. The chancellor declined to find either party in contempt.
DISCUSSION
¶ 18. When reviewing child-custody decisions, we “may reverse only when the *163 decision of the [chancery] court was manifestly wrong or clearly erroneous, or an erroneous legal standard was employed.” Hensarling v. Hensarling, 824 So.2d 588, 587 (¶ 8) (Miss.2002) (citations omitted). It is not this Court’s role to substitute our judgment for the chancellor’s judgment. Id. Furthermore, the “polestar consideration must be the best interest of the child.” Id.
¶ 19. “The test for a modification of child custody is: (1) whether there has been a material change in circumstances which adversely affects the welfare of the child and (2) whether the best interest of the child requires a change of custody.” Floyd v. Floyd, 949 So.2d 26, 29 (¶ 10) (Miss.2007) (citing Weigand v. Houghton, 780 So.2d 581, 585 (¶ 15) (Miss.1999)). “Modification must be based on conduct of the custodial parent that poses a danger to the mental or emotional health of the child.” Powell v. Powell, 976 So.2d 358, 361 (¶ 11) (Miss.Ct.App.2008) (citing Giannaris v. Giannaris, 960 So.2d 462, 467 (¶ 9) (Miss.2007)). When considering whether a material change in circumstances has occurred, the totality of the circumstances must be considered. Id. (citations omitted).
I. Modification of Child Custody
¶ 20. Robert argues the chancellor erred by modifying the child-custody arrangement. He contends the chancellor applied the wrong legal standard by failing to consider whether the material change in circumstances adversely affected the child. As stated above, the proper standard in considering modification of child custody is “(1) whether there has been a material change in circumstances which adversely affects the welfare of the child and (2) whether the best interest of the child requires a change of custody.” Floyd, 949 So.2d at 29 (¶ 10). This is the standard the chancellor referenced and applied in her order. She first considered whether a material change in circumstances had occurred that adversely affected the minor child, and then used an Albright analysis to consider the best interest of the child. Therefore, the chancellor did not apply the wrong legal standard.
¶21. Furthermore, the chancellor did not err by finding a material change in circumstances that adversely affected the welfare of the child or by finding the best interest of the child was served by awarding Jennifer primary physical and legal custody. In the time since the parties agreed to joint custody, Robert has shown aggression toward Jennifer on multiple occasions. In one instance, while he confronted Jennifer regarding her boyfriend, Robert left Gunner in his vehicle unattended with no air conditioning in ninety-degree heat. Robert also rejected a Father’s Day present from Gunner by throwing the present back at Jennifer in Gunner’s presence. Finally, Robert sent Jennifer a text message questioning whether Gunner was actually his child.
¶22. There are also various instances in which Robert has not provided adequate care to Gunner while in his custody. On one such occasion, when Robert was cutting down trees, Gunner was hit by a tree sapling. This resulted in a large bruise on Gunner’s shoulder. Robert should have given Gunner an emergency shot due to Gunner’s hemophilia; however, Robert failed to provide any emergency care. Also, as testified to by a neighbor, Robert let Gunner play by himself on a pier near Robert’s house without appropriate supervision. Additionally, Robert had allowed Gunner to ride on the back of a four-wheeler without a helmet. All of these actions pose a threat to a child with a serious medical condition such as hemophilia.
*164 ¶ 23. In addition, the parties have been unable to agree and cooperate on a variety of matters. The chancellor noted that the parties had not agreed on which school Gunner would attend. They were also unable to agree on necessary medical procedures. In fact, Robert’s failure to consent to certain dental procedures resulted in the premature extraction of Gunner’s tooth. The parties are clearly unable to confer and agree regarding important child-custody matters. Also, Gunner was unable to complete swimming lessons because Robert would not take him when Robert had custody. Moreover, the transfer of custody has become strained. Under the current situation, the parties are meeting at the Union County Sheriffs Office to exchange custody.
¶ 24. Based on the foregoing facts, taken in totality, it is clear a material change in circumstances has occurred since the initial child-custody agreement. It is also apparent that the change in circumstances has adversely affected the welfare of the child. As noted above, the actions of the custodial parent must pose a danger “to the mental or emotional health of the child.” Powell, 976 So.2d at 361 (¶ 11). Here, Gunner is in emotional turmoil due to the current arrangement. He cries during the time he is being taken to Robert. Gunner has started wetting the bed, is having behavioral problems at school, and is exhibiting signs of aggression. In addition, Robert’s actions resulted in the premature extraction of Gunner’s tooth, and Robert’s inaction led to the worsening of a bruise on Gunner’s shoulder-a serious condition for a hemophiliac child. Thus, the chancellor did not err by finding the current situation is adverse to the welfare of the child.
¶ 25. Based on her finding of a material change in circumstances adverse to the welfare of the child, the chancellor conducted an Albright analysis to determine the best interest of the child. Because Robert only argues the chancellor erred by finding a material change in circumstances adverse to the welfare of the child, we will not address the chancellor’s Albright analysis. We find the chancellor applied the correct legal standard and properly considered the totality of the circumstances in finding a material change in circumstances adverse to Gunner’s welfare. Furthermore, the chancellor did not err by finding the best interest of the child was served by awarding Jennifer full legal and physical custody. The chancellor did not abuse her discretion, and this issue is without merit.
II. Contempt of Court
¶ 26. Robert argues the chancellor erred by failing to find Jennifer in contempt of court for interfering with his right to participate in medical decisions relating to Gunner. Because the parties shared joint legal custody, he asserts he should have been involved in all medical decisions. Robert cites a dentist’s appointment for Gunner to have his teeth cleaned about which Jennifer did not inform him. During that visit, x-rays were done, and a dental surgery was scheduled. Jennifer told the dentist’s office that she had consulted Robert regarding the appointment.
¶ 27. In deciding that Jennifer was not in contempt for her failure to consult Robert before taking the child to the dentist, the chancellor stated: “The prior decree does not expressly address the decision-making rights of the parties with regard to the child’s medical care; however, it is undisputed the nature of the child’s physical condition may require the provision of medical care without the necessity of pre-approval by both parents.” Robert argues the dental appointment was not an emergency situation in which it was impractical to obtain his consent.
*165 ¶28. Mississippi Code Annotated section 98-5-24(5)(e) (Rev.2004) states:
For the purposes of this section, “joint legal custody” means that the parents or parties share the decision-making rights, the responsibilities!;,] and the authority relating to the health, education[,] and welfare of a child. An award of joint legal custody obligates the parties to exchange information concerning the health, education!,] and welfare of the minor child, and to confer with one another in the exercise of decision-making rights, responsibilities!,] and authority.
An award of joint physical and legal custody obligates the parties to exchange information concerning the health, education!,] and welfare of the minor child, and unless allocated, apportioned!,] or decreed, the parents or parties shall confer with one another in the exercise of decision-making rights, responsibilities!,] and authority.
Thus, the statute requires the parties to share and confer in decision-making responsibilities. Jennifer testified that she had planned to tell Robert about the dental appointment during a meeting at Gunner’s daycare scheduled for that day. During the meeting, Jennifer attempted to tell Robert that she had found a dentist for Gunner and that he had an appointment that afternoon. However, Robert acted hostilely toward her, and she was unable to inform him about the appointment. Robert may not now claim Jennifer was in contempt for her failure to include him in the decision-making process when he made it virtually impossible for her to do so. We find the chancellor did not abuse her discretion. This argument is without merit.
III. Right to Participate in Medical Decisions
¶29. Finally, Robert argues the chancellor erred by permitting Jennifer to make medical decisions for Gunner without Robert’s preapproval. The chancellor found that Gunner’s unique medical condition may require medical care where the preapproval of both parents should not be required. In Purviance v. Burgess, 980 So.2d 308 (Miss.Ct.App.2007), this Court addressed an issue similar to the one at hand. The minor child in Purviance had been diagnosed with autism and attention deficit hyperactive disorder. Id. at 312 (¶ 18). The chancellor found that it was in the best interest of the child to grant one parent the ability to make educational and medical decisions. Id. at 313 (¶ 20). We found no error in the chancellor’s determination that “this would create less friction between the parties” based on “the parents’ turbulent past regarding custody and visitation of the minor child.” Id.
¶ 30. Here, the parties were clearly unable to agree regarding certain decisions. Testimony at the hearing established that Gunner was even forced to have a tooth removed due to the parties’ inability to agree to preventive medical treatment. That instance, coupled with the fact that Gunner is a hemophiliac, justifies the chancellor’s decision. This issue is without merit.
¶ 31. THE JUDGMENT OF THE UNION COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR. ROBERTS, J., NOT PARTICIPATING.

. Albright v. Albright, 437 So.2d 1003 (Miss.1983).