CARLTON, J.,
dissenting:
¶ 9. I respectfully dissent from the majority’s opinion. I would reverse the order of contempt due to ambiguity in the provisions of the agreed order and because the record reflects Carpenter complied with the agreed order as written.
¶ 10. I would remand the case to the chancellor to clarify the terms of the agreed order to ensure the order facilitates both the award of joint legal custody and the child’s best interests. The ambiguity of the provisions of the order as to the parties’ method of communicating, and as to what activities of the child must be communicated, allows for continuing conflict. Moreover, with joint legal custody, no need exists to require Carpenter to inform Lyles of school managed, sanctioned, or supervised activities.
¶ 11. Lyles, who was awarded joint legal custody, complains that he lacked knowledge about extracurricular “school” events in which his daughter participated because Carpenter did not tell him about these events. As explained by the majority, the trial court held Carpenter in contempt for Lyles’s lack of knowledge about these school-related events, and in support of the contempt finding, the trial court explained its basis by stating Carpenter “did not know for sure that Lyles knew about the events.” The trial court held Carpenter in contempt for Lyles’s failure to know about school-related activities, even though as a parent with legal custody, Lyles possessed just as much authority to have contact and to communicate with the school as Carpenter. Additionally, under the terms of the agreed order, Carpenter possessed no duty to notify Lyles since he constituted the “receiving parent” of the disputed information about school or school-related activities.[1]
*1034 ¶ 12. As acknowledged, the agreed order fded on September 16, 2008, provides that Lyles and Carpenter will share joint legal custody of their daughter, with Carpenter being awarded primary physical custody.[2] Lyles’s claims reflect that he places upon Carpenter his own responsibilities as a parent to communicate with his child’s teacher and school and also to review the child’s school papers during visitation. Lyles is mistaken that the award of physical custody to Carpenter somehow relieves him of his responsibilities during visitation and of his authority and rights of legal custody under the law and the terms of the agreed order. The agreed order sets forth a visitation schedule with respect to weekends, holidays, and summers.[3] Then, paragraph 8 of the agreed order provides that the father, Lyles, shall also have visitation with the minor child every other Tuesday beginning after school when he shall pick up the child at school and continuing until the parties meet at a designated location at 7:30 p.m. The agreed order also provides for additional visitation as the parties mutually agree.
¶ 13. Paragraph 10 provides that school and extracurricular school activities of the minor child shall be communicated to the other parent when the “receiving parent” first obtains notice of the event and any associated preparation dates. The agreed order provides that the parties are to communicate about these extracurricular activities by email. The ambiguity of what constitutes a “receiving parent,” and responsibilities of that receiving parent, creates confusion and hostility.
¶ 14. Lyles cites three events in which his daughter participated without his knowledge. Lyles complains that he was not informed of the school reading fair at his daughter’s school and that his daughter participated in a school chess tournament unbeknownst to him. He also complains that his daughter participated in a school-sponsored piano audition also without his knowledge. However, on cross-examination, Lyles admitted that he picked his daughter up from school during the past year on Tuesdays and that, when doing so, he also had access to her backpack. The cross-examination of Lyles reflects that he picked his daughter up from school and had her backpack during the time period of the reading fair and the chess tournament, but he chose to not look into his daughter’s backpack.
¶ 15. Lyles explained on cross-examination that he did not check his daughter’s backpack out of respect for his daughter’s personal space, and that he expected his daughter to tell him if she possessed something in her backpack. Lyles admitted that he had access to the backpack, but he chose not to review its contents for anything, much less significant school notices or letters regarding school-related events. Carpenter’s testimony reflects that the school sent information, such as notices of *1035 test grades, home in the backpack. In the exercise of his visitation, Lyles fails to embrace that access to the child during visitation must be exercised with good judgment, keeping in mind always the child’s best interests. See McCracking v. McCracking, 776 So.2d 691, 694-95 (¶ 11) (Miss.Ct.App.2000) (affirming chancellor’s elimination of midweek visitation of noncustodial parent due to stress and instability on child). Lyles faced the consequences of his own poor choices and actions by missing these school-related events because he failed to review his daughter’s folder and notices in her backpack during his visitation.
¶ 16. Lyles testified that since he did not get an email from his daughter’s school, he did not know to go through her backpack. Lyles failed to comply with his obligations as the “receiving parent” as required by the agreed order and was allowed to also blame the school for not emailing him. With respect to the reasonableness of Lyles’s expectation of an email from the school, no evidence in the record reflects that the school ever utilized email to parents to inform them of daily, weekly, or other school events or of homework assignments or test grades. No evidence in the record shows Lyles contacted the school to request email notice of events. Perhaps such an assumption relates to Lyles’s judgment and parenting skills as related to his ability to fulfill his responsibilities cooperatively as a parent with legal custody.[4]
¶ 17. With respect to further evidence of inability to communicate cooperatively, Lyles admitted to receiving an email from Carpenter informing him of the piano audition and subsequent award ceremony, and he testified that he indeed attended the piano award ceremony. He complained that he did not attend the piano audition event itself because, as he testified, he did not understand Carpenter’s verb tense in the context of her email to him. Upon review of the record, I note that the testimony shows that no spectators were allowed into the piano audition. The record shows that Carpenter provided the child transportation to the audition but stayed outside, and that only the four judges and the child were allowed in to the audition. Lyles’s inclusion of missing the piano audition is without merit since no spectators were allowed.
¶ 18. Lyles’s attempt to place blame on Carpenter for him missing this non-event due to the verb tense of her email gives insight to his ability to communicate cooperatively in his child’s best interest. This evidence reflects an absence of an intent by Lyles to cooperate in good faith for his child’s best interest. Similarly, his avoidance of his responsibilities as receiving parent to check for school information in his daughter’s backpack during visitation reflects a lack of intent by Lyles to comply with the agreed order.
¶ 19. I turn to address the ambiguity of the provisions of the agreed order pertaining to the receiving parent and to address the evidence showing Carpenter in compliance and Lyles in breach. As discussed previously, the testimony in the record reflects that test folders were sent home from school on Tuesdays during the school year in issue and that Lyles picked the child up from school on Tuesdays. The test folders contained the information and *1036 notices regarding the child’s school events in dispute. While Lyles constituted the “receiving parent” in accordance with the terms of the agreed order, he has escaped responsibility for fulfilling his duties, not only as a responsible parent, but also as the receiving parent per the agreed order.[5] Since he was the “receiving” parent, Lyles was actually in breach of the agreed order in failing to notify Carpenter of those events. His choice to not open the child’s backpack, or school folders therein, fails to relieve him of his responsibilities under the agreed order. Again, Lyles’s actions and testimony display that Lyles lacked an intention of commitment to fulfill his obligations under the agreed order. See Pulliam v. Smith, 872 So.2d 790, 794-95 (¶ 8) (Miss.Ct.App.2004).
¶ 20. At trial, Carpenter asked the chancellor why she should inform Lyles of these school-sponsored events where he already had the information in his possession as the receiving parent, via the backpack and test folder. In explaining her understanding of the agreed order, Carpenter stated that since Lyles already had the information, she did not think that she would have to give him the information again since they communicated badly with each other. The trial court responded to her during the court’s examination of her, and the chancellor explained that she was required to inform Lyles because she did not know for sure that Lyles had gotten the information. The contempt order lacks a basis in the evidence and constitutes an erroneous application of the law.[6] The evidence shows that Lyles was the receiving parent and failed to comply with his duties under the order. The evidence also fails to show any willful noncompliance by Carpenter.[7] I would therefore reverse the finding of contempt and remand to the chancellor to revisit the propriety of the terms of the agreed order.
¶ 21. The terms of the order fail to facilitate cooperative joint custody. The events about which Lyles complains constituted school-sponsored or school-sanctioned events. The school reading fair occurred during school and appears to be a curricular school event. As a father with legal custody, albeit joint, Lyles possesses the authority to communicate with the school and his daughter’s teacher without the assistance, knowledge, or consent of Carpenter. Lyles’s responsibilities as legal custodian during visitation also impose some parental duties and responsibilities upon Lyles if he so chooses to exercise such visitation rights.[8] Moreover, Lyles possesses the authority to contact the school himself to determine when school events are to occur and to learn about test folders, and their contents, that come home to parents in backpacks. Lyles bears the responsibility to inform himself as to his own responsibilities while exercising visitation and as to his own authority of legal custody. The chancellor should clarify ambiguity regarding how to exer *1037 cise duties as a “receiving parent” under the agreed order, and the chancellor should clarify how, when, and specifically what activities are to be communicated.[9]
¶ 22. Mississippi statutory law and jurisprudence recognize that the chancellor may indeed allocate decision-making and duties to each parent sharing joint legal custody. In cases where decision making was apportioned, courts have determined that joint legal custody, including the communication required in support of such relationship, requires no moment-to-moment input or veto power over every large and small decision on child rearing but permits the nonresidential parent to participate in important decisions affecting the child. Goudelock v. Goudelock, 104 So.3d 158, 165 (¶¶ 29-30) (Miss.Ct.App.2012); Purviance v. Burgess, 980 So.2d 308, 312-13 (¶¶ 18-20) (Miss.Ct.App.2007); see also 24A Am.Jur.2d Divorce and Separation § 858 (joint custody allows parents to have an equal voice in decision making). Jurisprudence clearly recognizes that in an award of visitation privileges, the rights of parents as to reasonable access to the child should be exercised with good judgment, keeping always in mind the best interest of the child. See Buntyn v. Smallwood, 412 So.2d 236, 238 (Miss.1982). Lyles c eom-plains of missing the extracurricular school events, but he raises no claim that Carpenter excluded him from some decision-making in which he was entitled to participate pursuant to the award of legal custody.
¶ 23. Contempt is only appropriate where the contemnor willfully and deliberately ignores the order of the court. See Goudelock, 104 So.3d at 164-65 (¶¶ 26-28). Here, due to the ambiguity of the terms used in the agreed order, the contempt finding fails for lack of sufficient notice to Carpenter of her duties thereunder.[10] Additionally and as previously addressed, the record reflects Carpenter complied with the face of the agreed order and evidenced no willful noncompliance with it, and the record shows that Lyles breached his responsibilities as the receiving parent during visitation. The contempt finding relieves Lyles of his responsibilities under the agreed order as the receiving parent and penalizes Carpenter for Lyles’s failure to fulfill his obligations under the agreed order and responsibilities as a parent with legal custody. See Bredemeier v. Jackson, 689 So.2d 770, 777 (Miss.1997); Elliott v. Elliott, 877 So.2d 450, 456-57 (¶¶ 26-30) (Miss.Ct.App.2003). I would also remand the agreed order to the chancellor due to *1038 ambiguity therein for the chancellor to clarify the ambiguity to facilitate the award of joint legal custody herein in light of the hostile communication and relations of the parties.[11] See Giannaris v. Giannaris, 960 So.2d 462, 469 (¶ 12) (Miss.2007) (allowing changes in noncustodial home to cause the court to revisit original court orders is impermissible).
¶ 24. Based on the foregoing, I respectfully dissent from the majority’s decision.
JAMES, J., JOINS THIS OPINION IN PART.

. See Miss.Code Ann. § 93-13-1 (Rev.2004); Miss.Code Ann. § 93-5-24 (Rev.2004); see also Ballard v. Ballard, 843 So.2d 76, 80 (¶ 15) (Miss.Ct.App.2003) (addressing responsibilities of noncustodial parent during visitation and finding custodial parent not expected to share costs of travel with the noncustodial parent as noncustodial parent exercises rights of visitation).

. Paragraph 3 of the agreed order quotes Mississippi Code Annotated section 93-5-24 for the statutory definition of joint legal custody. Section 93-5-24(3) provides, in part, as follows: "[JJoint custody may be awarded, in the discretion of the court, upon application of one or both parents.” Section 93-5-24(5)(e) describes "joint legal custody” by stating the following:
[T]he parents or the parties shall share the decision-making rights, the responsibilities and the authority relating to the health, education, and welfare of a child. An award of joint legal custody obligates the parties to exchange information concerning the health, education, and welfare of the minor child, and to confer with one another in the exercise of decision-making rights, responsibilities and authority.

. See generally Cox v. Moulds, 490 So.2d 866, 870 (Miss.1986).

. See White v. Thompson, 569 So.2d 1181, 1185 (Miss.1990) (addressing that parent being given custody of child may exercise these privileges and responsibility in a more direct fashion than noncustodial parent, but noncustodial parent may exercise these rights when child is in his or her lawful custody); Kees v. Fallen, 207 So.2d 92, 94 (Miss.1968); see also 31 A.L.R.3d 1182 (1970).

. The parent-child relationship is for the benefit of the child, not the parent, and should therefore serve the best interest of the child. Blakely v. Blakely, 88 So.3d 798, 803 (¶ 15) (Miss.Ct.App.2012).

. Evans v. Evans, 75 So.3d 1083, 1087 (¶ 14) (Miss.Ct.App.2011).

. See Westerburg v. Westerburg, 853 So.2d 826, 828 (¶ 6) (Miss.Ct.App.2003) ("A citation of contempt is proper when 'the contemner has willfully and deliberately ignored the order or the court.' ”).

. See Wheat v. Koustovalas, 42 So.3d 606, 613 (¶ 21) (Miss.Ct.App.2010) ("‘Legal custody’ means more than simply having information about one's child; such responsibility and authority means sharing of 'decision-making rights, the responsibilities and the authority relating to the health, education and welfare of a child.' ”).

. Many school activities and school-related activities during non-instructional time benefit the development of the child mentally, physically, emotionally, and culturally. Such activities may include football practice and games after school or school approved or sponsored music or band concerts. Such activities fall within the school’s curricular activities, even though they occur during non-instructional time. See Morgan v. Swanson, 659 F.3d 359, 375 (5th Cir.2011) (acknowledging that activities that are school sponsored or school sanctioned or approved are not considered extracurricular but fall within the school's curricular activities). School employees, like coaches, perform official functions in supervising and managing these school sponsored or approved after-school activities. See Covington Cnty. Sch. Dist. v. Ma-gee, 29 So.3d 1, 7-8 (¶ 14) (Miss.2010); Clein v. Rankin Cnty. Sch. Dist., 78 So.3d 384, 388-89 (¶¶ 14-17) (Miss.Ct.App.2012); see Miss. Code Ann. § 37-7-301(q) (Supp.2012) (directing schools to provide athletic programs and other programs and requiring schools to regulate their establishment and operation); Miss.Code Ann. § 37-7-301(s) (Supp.2012) (authorizing school activity funds to be used to support school’s official or extracurricular school programs); Miss.Code Ann. § 37-9-71 (Rev.2007) (school possesses authority to suspend or prohibit students from participating in these school related-events occurring during non-instructional time or after school).

. See Evans, 75 So.3d at 1087 (¶ 14).

. Section 93-5-24(5)(e) clearly explains that legal custody means decision-making rights, and the responsibility and authority relating to the health, education, and welfare of the child. Lyles seeks the authority to enjoy the rights of legal custody and visitation, but he does not comply with the responsibilities required to fulfill those rights of legal custody and of physical custody while his daughter is in his care during visitation.