## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-01540-COA

**CLAYTON JOHN HICKEY**                                              **APPELLANT**

v.

**MELISSA CRENSHAW HICKEY**                                          **APPELLEE**

DATE OF JUDGMENT:                08/27/2013
TRIAL JUDGE:                     HON. MITCHELL M. LUNDY JR.
COURT FROM WHICH APPEALED:       DESOTO COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:         JERRY WESLEY HISAW
                                 H.R. GARNER
ATTORNEY FOR APPELLEE:           LEIGH A. RUTHERFORD
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:         FOUND APPELLANT IN CONTEMPT,
                                 DECLINED TO FIND APPELLEE IN
                                 CONTEMPT, MODIFIED CHILD SUPPORT,
                                 AND MODIFIED LEGAL CUSTODY
DISPOSITION:                     AFFIRMED IN PART, REVERSED AND
                                 RENDERED IN PART - 12/16/2014
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., ROBERTS, MAXWELL AND FAIR, JJ.**

**ROBERTS, J., FOR THE COURT:**

¶1.    Clayton Hickey appeals the Desoto County Chancery Court's judgment finding him in contempt for his failure to pay his ex-wife, Melissa Crenshaw Hickey, child support for their six-year-old son and their two-year-old daughter. Clayton claims that the chancellor erred because he was only obligated to pay for one-half of his children's undefined needs, and he had disagreed that the children needed to be in daycare. Clayton also claims that the chancellor should have found Melissa in contempt because she had not fulfilled her

obligation to file a joint tax return for 2011. Additionally, Clayton claims that the chancellor erred by modifying his child-support obligation, and awarding Melissa sole legal custody of the children.

¶2. After careful consideration, we find that the chancellor erred by awarding Melissa sole legal custody of the children when there was no evidence that the children had been adversely affected by the joint-legal-custody arrangement that Clayton and Melissa had agreed to when they divorced. However, we find no merit to Clayton's other claims on appeal. Accordingly, we affirm the chancellor's judgment in part and reverse and render in part.

## FACTS AND PROCEDURAL HISTORY

¶3. Clayton and Melissa were married on July 17, 2004, and divorced on January 9, 2012. They have two children. When Clayton and Melissa divorced, they entered into a property-settlement agreement. The agreement provided that Melissa would have primary physical custody of the children, but she and Clayton would share joint legal custody of them. The agreement also provided Clayton visitation with the children. According to the agreement, Clayton's visitation included "flexible" periods during weekdays "from time to time." Clayton also received weekend visitation during the first and third weekends of each month. Clayton and Melissa were to split visitation of the children equally during holidays "according to [Clayton's and Melissa's] work schedules." The agreement also addressed Clayton's summer visitation with the children, and visitation on specific holidays and events.

¶4. As for child support, the agreement provided:

Due to the great disparity in incomes and current financial situations of the

2

parties, the parties hereby request that there be no child support ordered at this time from [Clayton]; However, should his income ever become equal to that of [Melissa,] then the parties agree that child support should be paid by [Clayton] as per Mississippi [s]tate guidelines.

The agreement went on to state that "[u]ntil such time, the parties agree to split any and all needs of the minor children 50/50." Additionally, the agreement stated that Clayton and Melissa would file joint tax returns for 2011, but Melissa would claim both children as dependents for income-tax purposes after 2011. Neither party received alimony under the agreement.

¶5. The agreement also addressed the marital home. Clayton received use of it, but he agreed that he would be solely responsible for the mortgage payments, taxes, and insurance. Clayton also agreed to pay Melissa $32,000 for her share of the equity in the marital home. In the final judgment of divorce, the chancellor found that "the [p]roperty [s]ettlement [a]greement . . . is adequate and sufficient to settle all property issues and child custody and support issues."

¶6. Approximately eight months after the divorce, Melissa filed a "petition for citation of contempt[,] modification[,] and other relief." Melissa claimed that Clayton was in contempt because he had failed to split the expenses related to the needs of the children. According to Melissa, Clayton owed her approximately $5,700. Melissa also claimed that the chancellor should modify the provision of the judgment of divorce and award her sole legal custody of the children. Melissa's reasoning was based on her allegation that she and Clayton can not "agree on anything," and Clayton "only wants to argue." Melissa also alleged that Clayton "has caused problems at the [children's] school." Melissa requested that

3

the chancellor eliminate Clayton's right to visitation with the children during the week. Additionally, Melissa asked the chancellor to order Clayton to pay a specific amount of child support.

¶7. Clayton filed a counterclaim and alleged that Melissa was in contempt because she had not quitclaimed her ownership in the marital home, and she did not file a joint tax return for 2011. Clayton also claimed that a large portion of the expenses that Melissa sought were related to daycare expenses that were unnecessary, because he could take care of the children during the day.

¶8. Clayton and Melissa went before the chancellor on May 30, 2013. Clayton and Melissa both testified. After the hearing, the chancellor held that Clayton was in willful contempt because he had not paid half of the children's daycare expenses, which qualified as a need. The chancellor noted that in the seventeen months that followed the divorce, Clayton paid a total of $1,400 toward the needs of the children. The chancellor also noted that the children had both been in daycare from the time that Melissa's maternity leave had ended. The chancellor also mentioned that Clayton worked nights and slept during the day. The chancellor found that Clayton owed Melissa approximately $9,000 for his half of the children's daycare expenses. The chancellor also awarded Melissa $3,500 in attorney's fees related to Clayton's contempt.

¶9. The chancellor declined to find that Melissa was in contempt. The chancellor's reasoning was based on the fact that Melissa had given Clayton a quitclaim deed related to her rights to the marital home. Although Melissa had not filed a joint tax return for 2011, the chancellor noted that she had done so based on the advice of the person who had prepared

4

her tax return. However, the chancellor held that Clayton was entitled to one-half of the return that Melissa had received. Consequently, the chancellor reduced the amount that Clayton owed Melissa by approximately $3,000.

¶10. Next, the chancellor found that it was appropriate to award Melissa sole legal custody of the children. The chancellor found that there had been a material and substantial change in circumstances adverse to the children's best interest, but the chancellor did not elaborate regarding the nature of that change in circumstances. Likewise, the chancellor did not specify how the children had been adversely affected by that unspecified change in circumstances.

¶11. Finally, the chancellor modified Clayton's child-support obligation. Rather than paying one-half of the children's undefined needs, the chancellor ordered Clayton to pay Melissa $420 per month in child support. The chancellor noted that the monthly figure was a deviation from the statutory guideline for two children, but the deviation was necessary because of the children's daycare and after-school-care expenses. Clayton appeals.

**ANALYSIS**

I.   CONTEMPT

¶12. Clayton argues that the chancellor should not have found him in contempt for not paying half of the children's daycare expenses. He notes that he and Melissa initially had joint legal custody of the children, and he was required to pay half of the costs for the children's needs. He was not expressly obligated to pay for half of daycare expenses. Clayton's position was that he was available to care for the children during the day, so daycare expenses were unnecessary. Clayton further notes that Melissa wrote off the daycare

5

expenses on her taxes. He reasons that the chancellor should not have held him in contempt because he was not in willful violation of an obligation. According to Clayton, because the chancellor had to first find that daycare expenses were a need, the agreement was ambiguous, and he should not have been held in contempt because he did not fulfill an ambiguous obligation. Clayton concludes that the chancellor should not have ordered him to pay Melissa approximately $6,000 in daycare expenses.

¶13. Whether a party is in contempt is a question of fact to be decided on a case-by-case basis. *R.K. v. J.K.*, 946 So. 2d 764, 777 (¶39) (Miss. 2007). A chancellor has substantial discretion in deciding contempt matters because of the chancellor's "temporal and visual proximity" to the litigants. *Mabus v. Mabus*, 910 So. 2d 486, 491 (¶20) (Miss. 2005). This Court "will not reverse the chancellor's findings if they are supported by substantial credible evidence." *Doyle v. Doyle*, 55 So. 3d 1097, 1110 (¶44) (Miss. Ct. App. 2010).

¶14. "A citation for contempt is proper when the contemner has willfully and deliberately ignored the order of the court." *Id*. "The purpose of a civil contempt order is to coerce a part[y's] compliance with a court order." *Id*. at (¶46). "The burden then shifts to the defendant who may rebut the prima facie case by proving inability to pay, lack of willfullness regarding the contempt, ambiguity in the order's provisions, or impossibility of performance." *Id*. at 1111 (¶46). "Civil contempt, such as here, must be proven by clear and convincing evidence." *Id*. "[B]efore a person may be held in contempt of a court judgment, the judgment must be complete within itself – containing no extraneous references, leaving open no matter or description or designation out of which contention may arise as to the meaning." *Wing v. Wing*, 549 So. 2d 944, 947 (Miss. 1989). "Nor should a final decree

6

leave open any judicial question to be determined by others, whether those others be the parties or be the officers charged with execution of the decree." *Id*.

¶15. Although the agreement did not require that Clayton pay regular child support, Clayton was required to pay one-half of the children's needs. In approximately eight months since the divorce, Clayton had paid Melissa roughly $1,400 toward the children's needs.[1] The chancellor noted that the children had been in daycare from the time that Melissa's maternity leave had ended. The children were in daycare during the marriage, and they were in daycare when Clayton and Melissa divorced. The chancellor also recognized that Clayton worked nights as an emergency medical technician (EMT), and he slept during the day. It was reasonable for the chancellor to find that Clayton was not available to provide regular child care during the week. It was also reasonable for the chancellor to find that because the children had been consistently in daycare for the vast majority of their lives, which included the time before Clayton and Melissa's divorce, daycare qualified as a "need" contemplated by the agreement. It follows that the chancellor could have reasonably found Clayton in contempt because he did not pay one-half of the children's needs.

¶16. Next, Clayton claims that the chancellor erred when he found that Melissa was not in contempt because she did not file a joint tax return for 2011. Melissa testified that she did not file a joint tax return for 2011 because the person who prepared her taxes advised her that

---

[1] Clayton had two mortgages on the former marital home. One of those mortgages required a monthly payment roughly equal to the total amount of support that Clayton had paid Melissa since the divorce.

7

because she was divorced, she could not file a joint tax return.[2] Clayton places great emphasis on one sentence of Melissa's cross-examination, when she testified that "[o]bviously, I didn't file . . . jointly because I didn't want to - - ." Clayton interprets Melissa's testimony as though she simply chose not to file a joint tax return. However, Clayton's interpretation is a self-serving mischaracterization of the transcript, which can be interpreted as though Melissa's testimony was incomplete. That is, by including two dashes at the end of the sentence, the court-reporter who transcribed Melissa's testimony indicated that Melissa had not finished explaining why she did not file a joint tax return. Throughout the rest of her testimony, Melissa consistently explained that she did not file a joint tax return for 2011 because the person who had prepared her taxes advised her that she could not do so. Furthermore, there was testimony that Clayton never presented a joint tax return for Melissa to sign. Additionally, the chancellor ordered Melissa to pay Clayton one-half of the amount of the tax return that she received for 2011, thus mitigating the need to find her in contempt. We find that the chancellor acted within his discretion. Therefore, we find no merit to this issue.

## II. ATTORNEY'S FEES

¶17. Clayton argues that the chancellor should not have ordered him to pay Melissa $3,500

---

[2] The chancellor signed the original judgment of divorce on December 20, 2011. However, the judgment was not filed until January 9, 2012, and it was not entered on the general docket until February 6, 2012. It appears as though Melissa's tax preparer advised her that she could not file a joint tax return for 2011 because the tax preparer concluded that the effective date of the divorce occurred during 2011, rather than 2012. We note that "[a] judgment shall be effective only when entered as provided in [Rule] 79(a)" of the Mississippi Rules of Civil Procedure. M.R.C.P. 58. The comment to Rule 79(a) states that an entry relates to the date "on which the entries are made in the general docket."

in attorney's fees. Clayton's reasoning is dependent on our finding merit to his claim that the chancellor erred by finding him in contempt. Because we found no merit to that claim, we find no merit to his claim that he should not have been required to pay Melissa $3,500 in attorney's fees.

III.    CHILD SUPPORT

¶18.    Next, Clayton claims that the chancellor erred when he calculated Clayton's modified child-support obligation. That is, Clayton does not argue that the chancellor erred by modifying his child-support obligation. Instead, Clayton claims that the chancellor erred when he deviated from the statutory child-support guidelines.

¶19.    "The amount of child support to be awarded in Mississippi is controlled by statute with some discretion left to the chancellor." *McGehee v. Upchurch*, 733 So. 2d 364, 371 (¶37) (Miss. Ct. App. 1999). "Decisions regarding modification of child support are within the discretion of the chancellor, and [an appellate court] will reverse only where there is manifest error in findings of fact, or an abuse of discretion." *Powell v. Powell*, 644 So. 2d 269, 275 (Miss. 1994). Furthermore, "[t]he process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains [an appellate court's] review." *Gillespie v. Gillespie*, 594 So. 2d 620, 622 (Miss. 1992). A chancellor may modify child support if there has been "a substantial or material change in the circumstances of one or more of the interested parties: the father, the mother, and the child or children, arising subsequent to the entry of the decree to be modified." *Garcia v. Garcia*, 97 So. 3d 109, 112 (¶12) (Miss. Ct. App. 2012) (quoting *Edmonds v. Edmonds*, 935 So. 2d 980, 987 (¶19) (Miss. 2006)). We will reverse a

chancellor's decision to modify child support if the chancellor abused his discretion. *Moulds v. Bradley*, 791 So. 2d 220, 226 (¶14) (Miss. 2001).

¶20. Clayton notes that he presented evidence that his monthly adjusted gross income was approximately $1,680. Relying on the guideline for the support of two children as set forth in Mississippi Code Annotated section 43-19-101(1) (Supp. 2014), Clayton states that he should have to pay Melissa no more than twenty percent of his adjusted gross income in child support. Clayton reasons that his monthly child-support obligation should be $337 per month – not $420 per month. Clayton also argues that it is inequitable to require him to pay $420 per month based on his own living expenses, including the $300 in arrearages that he must pay Melissa related to his being in contempt. Finally, Clayton claims that it is inequitable to require him to pay $420 per month in child support because Melissa earns more money than him.

¶21. There is a rebuttable presumption that a noncustodial parent should pay twenty percent of his or her adjusted gross income in support of two children. Miss. Code Ann. § 43-19-101(1). A chancellor may deviate from the guidelines set forth in section 43-19-101(1) if the chancellor finds that additional child support is necessary because of "[p]ayment by the obligee of child care expenses in order that the obligee may . . . retain employment . . . ." Miss. Code Ann. § 43-19-103(i) (Supp. 2014). The chancellor specifically held that "after[-]school [care], daycare[, and] other expenses necessitate[] an upward deviation of support." There was evidence that Clayton had additional sources of income other than his

10

earnings as an EMT.[3]   It was within the chancellor's discretion to find that child-care

expenses required an upward deviation in Clayton's child-support obligation.  We find no

merit to this issue.

IV.   LEGAL CUSTODY

¶22.   Next, Clayton argues that the chancellor erred when he modified legal custody of the

children and awarded Melissa sole legal custody.  According to Clayton, "[t]he record is

utterly void of any 'adverse affect' on the minor children."  Clayton reasons that it is

necessary to reverse the chancellor's judgment.

¶23.   At the outset, we note that this issue solely pertains to the legal custody of the

children.  When Clayton and Melissa divorced, they agreed to share joint legal custody of

the children.  Parents who have joint legal custody are obligated "to exchange information

concerning the health, education[,] and welfare of [their children], and to confer with one

another in the exercise of decision-making rights, responsibilities[,] and authority."  Miss.

Code Ann. § 93-5-24(5)(e) (Supp. 2014).  Mississippi Code Annotated section 93-5-24(4)

(Supp. 2014) "creates a presumption in favor of joint custody where the parents have agreed

to it." *Lowery v. Lowery*, 25 So. 3d 274, 296 (¶54) (Miss. 2009).  When parents have joint

legal custody of children, that custody is modifiable if one of the parents demonstrates "that

a material change in circumstances has occurred."  Miss. Code Ann. § 93-5-24(6) (Supp.

2014).  Furthermore, the material change in circumstances must adversely affect the best

_____

[3]   As an adverse witness, Clayton was confronted with his 2012 tax return, which indicated that he had earned approximately $4,400 from his lawn service, which Clayton minimized as merely "cutting [his] Dad's yard."  Clayton also admitted that he had a "bunch" of different jobs during 2012.

interest of the children. *Touchstone v. Touchstone*, 682 So. 2d 374, 377 (Miss. 1996). The best interest of the children is always the foremost consideration. *Shepherd v. Shepherd*, 769 So. 2d 242, 245 (¶11) (Miss. Ct. App. 2000) (citing *Riley v. Doerner*, 677 So. 2d 740, 744 (Miss. 1996)).

¶24. In making this determination, the totality of circumstances must be considered. *Ash v. Ash*, 622 So. 2d 1264, 1266 (Miss. 1993). Resolution of factual disputes is always a matter entrusted to the sound discretion of the chancellor. *Carter v. Carter*, 735 So. 2d 1109, 1114 (¶19) (Miss. Ct. App. 1999). We may reverse only if the chancellor abused his discretion, or the decision was manifestly wrong or clearly erroneous. *Horn v. Horn*, 909 So. 2d 1151, 1159 (¶20) (Miss. Ct. App. 2005). "The word 'manifest,' as defined in this context, means 'unmistakable, clear, plain, or indisputable.'" *Lowrey v. Lowrey*, 919 So. 2d 1112, 1118 (¶21) (Miss. Ct. App. 2005) (citation omitted).

¶25. The chancellor's July 2013 order states "that there is a material and substantial change in the circumstances of the parties that adversely affect[s] the best interests and welfare of the children . . . ." However, approximately one month later, the chancellor entered an opinion and stated:

> It is very obvious from the testimony that subsequent to the divorce of the parties[,] substantial changes in circumstances have occurred that adversely affect the welfare of the child[,] and such require a modification of joint legal custody. Disagreements as to [the] needs of the children, daycare, pick up at school, etc. (including involving the police at one instance) show[] this court that modification is necessary to ensure order and eliminate controversy involving the children.

Although the chancellor said that there had been material or substantial changes that adversely affected the children, the chancellor never elaborated regarding how the children

12

had been adversely affected. The chancellor mentioned that modification of Clayton and Melissa's joint legal custody was necessary "to ensure order and eliminate controversy involving the children." But that is not the applicable legal standard.

¶26. What is more, the chancellor apparently based his decision on the fact that Clayton and Melissa had "[d]isagreements as to [the] needs of the children, daycare, pick up at school, etc. (including involving the police at one instance)[.]" According to the record, the only disagreement "as to [the] needs of the children" was whether daycare qualified as a "need" as defined in the agreement. By modifying Clayton's child-support obligation, the chancellor completely eliminated the possibility that Clayton and Melissa will disagree in the future as to what qualifies as a "need" that they must equally fund.

¶27. Additionally, the record indicates that Clayton and Melissa got into an argument at their son's school because Clayton would not agree to allow Melissa's boyfriend to pick up the children unless Melissa reciprocated and allowed Clayton's girlfriend to do so. According to Melissa, Clayton provoked her and caused her to use profanity toward him. A law-enforcement officer was within earshot. According to Clayton, the officer intervened and asked him whether he wanted to have Melissa arrested. Clayton declined. Although the chancellor's use of "etc." indicates that Clayton and Melissa had other disagreements, the record indicates that those disagreements were relatively minor, and none of them had an adverse affect on the children.[4]

---

[4] Melissa testified that Clayton had eaten lunch with their son at school without telling her. Because they can only visit their son a finite number of times each month, Melissa did not have an opportunity to discuss the fact that she wanted to visit their son at school. Melissa also testified that Clayton became angry when he went to visit their son at

13

¶28. There is simply no evidence in the record to support a conclusion that either child had been adversely affected by the two disagreements that the chancellor specifically mentioned. In fact, there was no evidence that either child was even aware of the two disagreements. Clayton and Melissa's son, John, was six years old when his parents argued at his school. However, he was not present during Clayton and Melissa's argument, because he was in class. Clayton and Melissa's two-year-old daughter, Sarah, was nearby during the argument, but there was no evidence that she was aware of it. There was certainly no evidence that she suffered an adverse affect because of it.

¶29. In *Goudelock v. Goudelock*, 104 So. 3d 158 (Miss. Ct. App. 2012), this Court reviewed a chancellor's decision to modify joint physical and legal custody of a child. Approximately seven months after the divorce, the ex-wife sought to obtain sole physical and legal custody of the child. *Id*. at 160 (¶3). The chancellor found that it was in the child's best interest for the ex-wife to have sole physical and legal custody of the child. *Id*. at 162 (¶17). This Court found no merit to the ex-husband's claim that the chancellor had erred. *Id*. at 164 (¶25). We noted that "the parties had not agreed on which school [the child] would attend," and the ex-husband's "failure to consent to certain dental procedures resulted in the premature extraction of [the child's] tooth." *Id*. at (¶23). The child's dentist had recommended measures to avoid further decay of teeth that would lead to extraction without

___

school, and he discovered that their son had stayed home because of an illness. According to Melissa, Clayton was upset because she had not informed him that their son was sick before Clayton went to visit him during lunch. There was also testimony that Clayton did not confer with Melissa before he signed up their son for basketball during the summer. There was no evidence that either of the children were aware of any of those disagreements.

treatment. *Id*. at 161 (¶12). Because the child suffered from hemophilia, an extraction was potentially dangerous. *Id*. The ex-husband refused to allow the child to obtain treatment in Jackson, so the child's teeth remained untreated for approximately seven months. *Id*. Consequently, the tooth decay progressed to the point that the child had to undergo an extraction. *Id*.

¶30. Here, there is no evidence that the children had any unusual medical needs, and there was no evidence that the children's medical needs had been neglected in any way. The supreme court has held that isolated incidents do not justify a change of custody. *Touchstone*, 682 So. 2d at 378 (quoting *Smith v. Jones*, 654 So. 2d 480, 487 (Miss. 1995)). "[I]t must be the overall circumstances in which a child lives, likely to remain unchanged in the foreseeable future and adversely impacting a child, to warrant a change of custody." *Id*. (quoting *Tucker v. Tucker*, 453 So. 2d 1294, 1297 (Miss. 1984)). In *Lipsey v. Lipsey*, 755 So. 2d 564, 565 (¶4) (Miss. Ct. App. 2000), this Court held that a chancellor erred when he modified child custody. We based our decision on the fact that "the chancellor gave no reason for modifying custody except for citing the parties' inability to cooperate with one another." *Id*. at 566 (¶7). This Court stated that it "will not . . . allow a change in custody when the child has exhibited no adverse impact and [the child] is equally cared for by both parties." *Id*. at 567 (¶8).

¶31. Based on the record before us, there is no evidence that the children had been adversely affected by the fact that their parents had joint legal custody. The record is simply silent in that regard. Nothing in the record indicates that the children were unhappy, or that any of their needs had been neglected. Because the chancellor did not find that the children

15

had been adversely affected in any way by Clayton and Melissa's disagreements, we are compelled to follow the supreme court's precedent and reverse the chancellor's judgment. Consequently, we render a judgment reinstating Clayton and Melissa's joint legal custody.

¶32.    **THE JUDGMENT OF THE DESOTO COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ALL COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN THE PARTIES.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR.  JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.**